THE PEOPLE *ex rel.* John J. Healy, State's Attorney,

*v.*

WILLIAM P. THORNTON.

*Opinion filed June 19, 1907.*

DISBARMENT—*evidence of guilt must be clear to warrant disbarment.* To justify disbarment of an attorney the evidence of his guilt with reference to the transactions charged in the information must be clear; and it is not sufficient that, taken as a whole, the evidence shows a state of facts not entirely creditable to the respondent and the other parties to the transactions, but fails to show that the respondent has been guilty of dishonorable or criminal conduct.

INFORMATION to disbar.

JOHN J. HEALY, State's Attorney, (HOYT KING, and JOHN L. FOGLE, of counsel,) for relator.

JOHN S. COOPER, JAMES E. MUNROE, and RUSSELL WHITMAN, for respondent.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an information filed in this court by John J. Healy, as State's attorney for Cook county, acting in conjunction with John F. Holland and other attorneys, who constitute the grievance committee of the Chicago Bar Association, praying that the license of William P. Thornton as an attorney of this court be revoked.

The charges set forth in the information divide themselves substantially under three heads:

*First*—That respondent, who had theretofore had considerable professional connection with the insurance department of the State and with Fred H. Rowe, attorney for that department, entered into a corrupt agreement with one J. W. Lauderdale, substantially as follows: That a certain life insurance company (the Traders' Mutual) was in the hands of a receiver appointed by the circuit court of Sangamon county upon the application of the insurance department of the State of Illinois; that another life insurance company, (the Western Union,) with which said Lauderdale and his alleged principal, C. F. Binckley, were connected, was desirous of purchasing the list of names of the policy holders in the insolvent company with a view to securing the re-insurance of such as might wish to continue; that in consequence of said agreement between Lauderdale and the respondent, Thornton, an order was entered by the Sangamon county circuit court authorizing the receiver, J. W. Butler, to sell the list of names for $2000, whereas it was worth a much larger sum; that said Lauderdale and one Morgan, acting for said Binckley and the Western Union Life Insurance Company, thereupon paid the receiver the $2000 for the list of names and in addition paid respondent $6000, of which $1000 was to be retained by respondent as his share and $5000 was to be corruptly used to influence the receiver to sell the list of names for such inadequate sum, and to cause the insurance department, by its attorney, Fred H. Rowe,

to consent to said transfer; that respondent imposed a fraudulent agreement upon the Sangamon county circuit court without its knowledge.

*Second*—That respondent, while acting as special attorney for the insurance department of Illinois, by threats of prosecution and otherwise, extorted from one E. A. Shanklin, an insurance agent, $500. It appears that a bill for injunction was filed in the circuit court of Cook county November 8, 1902, by Henry Yates, insurance superintendent of Illinois, against the American Trust and Insurance Company and others. It also appears that a suit was brought in the same court by the People, by Charles S. Deneen, State's attorney, suing in his behalf, one-half for the use of the People and one-half for the use of William P. Thornton, against Ernest A. Shanklin, for the collection of penalties for unlawful acts in connection with issuing insurance policies. On April 9, 1903, a stipulation was entered into by the State's attorney, respondent, said Shanklin and his attorney, that upon the filing of a declaration in said suit judgment might be entered against defendant, Shanklin, for $1000, and a further stipulation that upon the payment of said $1000 in specified installments, and the delivery to said Thornton of a policy register issued by Ernest A. Shanklin & Co. and offered in evidence in the injunction proceeding previously referred to, then said judgment should be a bar against any further suits for penalties against said Shanklin for infraction of the insurance laws of the State incurred prior to the date of said judgment. Relator claims that respondent learned of specific violations of the law by Shanklin in the course of the injunction proceeding, and thereupon, by threats of bringing a civil or criminal action, extorted from said Shanklin $500. Respondent admits receiving the $500, but claims it was rightfully his, as informer in the penalty suit, according to law; that the stipulations were made in due course of legal procedure, and that a strong moving cause for thus settling the suit was the agreement of Shanklin to turn over his pol-

icy register, which would be of great value in future prosecutions.  He denies that he extorted the $500 by threats.

*Third*—That respondent, while acting as special attorney for said insurance department and associated with Fred H. Rowe, its attorney, under pretense of immunity from being made defendants in a suit against certain persons alleged to be unlawfully writing insurance, received from various persons or firms sums of money aggregating $800.  It appears that there were in Chicago, at the time of the transaction complained of, a number of persons representing what is called "Lloyd insurance,"—that is to say, insurance issued by a number of underwriters, usually by attorney under power, obligating themselves, each, to pay a certain sum in case of loss;  that a suit was brought by the insurance department of the State, by William R. Vredenburg, superintendent, against the Lloyds of New York City and other associations and underwriters, May 14, 1903, in the circuit court of Cook county, praying for an injunction against the defendants from writing or soliciting insurance in Illinois. Prior to the filing of this bill for injunction respondent received from seven individuals or firms engaged in writing Lloyd insurance the sum of $800,—one payment of $200 and six of $100 each;  that none of the parties so paying were made defendants to said bill.  Relator contends that it was generally known that respondent was connected and associated with Fred H. Rowe, and that these payments, while obtained under the pretext of being retainers, were in reality payments to Thornton for not being included as defendants in the contemplated bill for injunction.  Respondent, on the contrary, claims that the sums constituting the $800, which he admits receiving, were *bona fide* retainers for assistance to be rendered in restraining the Lloyd companies, which issued what are known as "limited" policies, in which the underwriters limit their liability as to loss from all policies in force, and claims said amounts were contributed by agents who wrote what are known as "unlimited" policies,

because they desired to have the "limited" policies (which were issued in most cases in behalf of underwriters living in the east) prohibited, as being in unfair competition with their unlimited policies.

These acts, the relator alleges, are unprofessional, dishonorable and criminal, and make respondent unworthy to remain an attorney and counselor of this court.

The evidence is too voluminous to undertake to give a synopsis of it or the substance of all its material parts. The abstract of it covers 492 printed pages. In most of its material portions the testimony of the respective parties is irreconcilably conflicting. In many instances these conflicts are as to matters about which the witnesses could not be mistaken, for the matters they testify to do not purport to be matters of opinion or judgment, but are claimed to be facts of which the witnesses had absolute knowledge.

While the evidence offered by relator tended to prove all the charges in the information, we think the strongest testimony offered by him was as to the first charge, namely, the transaction with the receiver of the Traders' Insurance Company. For that reason we will not attempt to set out or discuss the evidence relating to the other charges in the information. Having reached the conclusion that the evidence as to the charge in the first count of the information fails to establish respondent's guilt by that clear and satisfactory preponderance which would make it our duty to strike his name from the roll of attorneys, a discussion of the evidence relating to the other charges would be a useless work. We will therefore content ourselves with setting out the substance of the testimony of Lauderdale, who may be regarded as the principal witness for the relator, and that of respondent. Both were corroborated by other testimony as well as contradicted.

Lauderdale testified that he went to Springfield about October 23, 1903, to see about securing a transfer of the business of the Traders' Mutual Life Insurance Company to

the Western Union Life Insurance Company. Shortly pre-
vious, in pursuance of the prayer of a bill filed by the insur-
ance department of the State of Illinois, J. W. Butler was
appointed by the circuit court of Sangamon county receiver
of said Traders' Insurance Company. C. F. Binckley was
manager of the Western Union company and Lauderdale
was in his employment and representing him. Lauderdale
testified he met respondent at the Leland Hotel, in Spring-
field, and made known to him his desire to secure the list of
the Traders' policy holders and continue the insurance for
those who were willing to continue with the Western Union
Insurance Company. He says Thornton told him the trans-
fer could be secured for $9000; that he replied that was
too much and Binckley would not pay that amount; that
Thornton then said it could probably be secured for $8000,
and suggested that Lauderdale see the directors of the Trad-
ers' company and they would probably put up part of the
money; that he (Lauderdale) then went and saw one of the
directors of the Traders' company and informed him of his
business, and that said director telephoned for Mr. Dooling,
secretary of the Traders' company, to come to his office,
which he did, and it was there agreed they would put up
$3000 of the $8000 Mr. Thornton said would be required.
Lauderdale says he then returned to Mr. Thornton and in-
formed him of this fact and agreed to pay for the Western
Union company the remaining $5000. Lauderdale says
Thornton told him, after the payment of the $8000 was
agreed upon, $2000 of the amount was to be paid to the re-
ceiver for the transfer, $1000 to him (Thornton) for his
fees as attorney, and $5000 would "probably go indirectly
for campaign purposes to Mr. Rowe and Mr. Butler." Mr.
Rowe was the attorney for the State insurance department,
and he and Thornton officed together in the New York Life
building, in Chicago. It appears that Thornton was em-
ployed by the insurance department in a number of cases,
but he says he was not in the regular employment of said

department. The information charges that on account of his association with Fred H. Rowe, the attorney for the insurance department, and the fact of his employment by said Rowe or said department in various cases, Thornton was recognized by persons in Chicago engaged in the general insurance business as an attorney and representative of the insurance department of the State of Illinois. Lauderdale testifies he did not consult Thornton about the transfer as his attorney; that Thornton told him he represented Mr. Rowe, as attorney for the insurance department. After the $8000 had been promised, an order of court was secured approving the sale by the receiver to the Western Union Insurance Company for $2000 and the parties went to Chicago. No money was paid the receiver at Springfield, but he, Dooling, Thornton and Lauderdale all went to Chicago, and the books and papers desired by the Western Union company were sent to Chicago to Mr. Thornton or in his care. The $2000 was paid the receiver in Thornton's office in Chicago and the $6000 to Thornton at the same time and place.

Respondent testified that he had nothing to do with the suit in which the receiver was appointed for the Traders' company; that he was employed by one Willis Palmer, who was an officer of the Western Union Insurance Company, to procure the re-insurance of the Traders' company under a contract authorizing him to pay any amount therefor not exceeding $8000. Respondent says it was agreed if he bought the re-insurance for less than $8000 he was to have as his compensation the difference between the amount paid for said re-insurance and said $8000; that if he was required to pay the full $8000 for it he was to receive no compensation. Respondent admits going to Springfield and meeting Lauderdale there, but denies almost everything Lauderdale says occurred there. He says Lauderdale spoke to him about the Traders' company's business, and he (respondent) told him, in substance, what he says his agreement with Palmer was. Respondent says he saw Butler, receiver of the Traders'

.company, and asked him if he was going to re-insure that company's risks, and Butler asked him to make an offer for it. Respondent says he replied he had a client he thought would pay $2000 or $3000 for it; that at that time the agreement was not made, but in the evening of the same day respondent offered, and Mr. Butler, the receiver, agreed to accept, with the sanction of the court, $2000. Respondent testified that the next morning the receiver, himself, and two or three lawyers whose names he could not remember, went into court in Springfield and procured an order from the court authorizing a sale of the re-insurance to the Western Union company. He says the reason the parties went to Chicago to pay and receive the money was because they didn't have any money in Springfield to pay anybody. Respondent denies saying he had to pay anything to Rowe or Butler and denies he ever did pay them anything. The money was paid over, $2000 to the receiver, Butler, and $6000 to Thornton, in his office the day following that on which the order authorizing and approving the sale was made. Five thousand dollars of it was paid by Morgan, who was also an agent of the Western Union company, and $3000 by Dooling, an officer of the defunct Traders' Insurance Company.

We will not undertake to set out the testimony of the witnesses as to the circumstances of the payment of the money, the closing of the deal and what was said between the parties at the time. The evidence of the respective parties is in hopeless conflict. The relator, to support the allegations of the information as to respondent's relation to the State insurance department and Mr. Rowe, its attorney, offered proof showing payment to respondent by the insurance department of the State, at different times, of various sums of money for services and expenses in connection with said department, amounting to a considerable sum of money. It was also shown that Mr. Rowe paid respondent's hotel bill at the Leland Hotel, in Springfield, at the time he was there

when the transaction with the receiver of the Traders' Insurance Company occurred. Respondent testifies he paid Mr. Rowe the money the latter had paid for his hotel bill, and did not know it had been charged to the State by Rowe until the hearing before the grievance committee of the Chicago Bar Association on charges preferred against respondent. Rowe testified that along about the second of the month of November a clerk of the Leland Hotel called his attention to the fact that respondent had gone away from the hotel leaving an unpaid bill of $10; that he (Rowe) paid it and charged it to his expense account as attorney for the insurance department, supposing at the time that it was correct; that afterwards respondent paid him the $10, but witness neglected to charge himself with it until his attention was called to it on the hearing of the charges preferred against respondent before the grievance committee of the Chicago Bar Association in the month of December, 1904. This explanation is not incompatible with the truth, but respondent's leaving the hotel without paying his bill, it being paid later by the attorney for the insurance department and charged to his expense account, and, although re-paid by respondent a month later, that the account with the insurance department was not corrected until a year later, when the transaction was made public by an investigation before a committee of the Chicago Bar Association, are unfortunate circumstances for respondent and well calculated to create suspicion. Respondent emphatically denies that he was regularly in the employ of the State insurance department, but says his connection with that department was in certain cases and matters where he was specially employed; that there was no partnership arrangement or agreement between him and Mr. Rowe, and that although they officed in the same suite, each paid his own share of the expenses and there were no joint business relations between them. It is apparent from the evidence, however, that respondent's associations with the attorney for the insurance department and his employment by said

department in certain instances created an impression among people in the city of Chicago engaged in the insurance business that in matters relating to insurance it was a discreet thing for those engaged in that line of business to deal with and maintain friendly relations with respondent. That he must have known of the advantages resulting from his relations with the State insurance department and its attorney cannot be doubted. But there is no satisfactory proof that he used the advantages these relations gave him for dishonest and unprofessional purposes. The testimony offered by relator and respondent as to the first charge in the information, taken altogether, shows a state of facts not entirely creditable to the parties engaged in that transaction, but does not establish by that degree of proof required in proceedings of this character, respondent's guilt of dishonorable and criminal conduct, as charged in the information. In *People* v. *Matthews*, 217 Ill. 94, which was a disbarment proceeding, the court found that the evidence tended to prove the charges in the information, but said (p. 103) : "A careful consideration of the testimony leaves us unable to say that the charges set forth in the information filed against the respondent have been sustained by the character of proof required to justify the legal conclusion of guilt. The punishment to be inflicted by disbarment of an attorney is the destruction of his professional life. Only clear and satisfactory proof can justify a decision from which would flow consequences of such grave nature. In *People ex rel.* v. *Harvey*, 41 Ill. 277, we said that to justify the infliction of such heavy punishment as disbarment 'the case must be clear and free from doubt, not only as to the act charged, but as to the motive.' "

We are of opinion the evidence is insufficient, under the rule in such cases, to establish the guilt of respondent of any of the charges in the information, and the rule to show cause why he should not be disbarred is discharged.

*Rule discharged.*