(No. 20357.—

*In re* INFORMATION TO DISCIPLINE CERTAIN ATTORNEYS
OF THE SANITARY DISTRICT OF CHICAGO.

*Opinion filed December 23, 1932—Rehearing denied Feb. 23, 1933.*

Jones and Orr, JJ., specially concurring.

John L. Fogle, and Willard R. Matheny, (Walter F. Dodd, William P. Sidley, Francis X. Busch, Charles P. Megan, Walter H. Eckert, Richard Bentley, and Albert E. Jenner, Jr., of counsel,) for relator.

George A. Cooke, and David R. Clarke, (Colin C. H. Fyffe, and John Harrington, of counsel,) for respondent Harry J. Berman; Rose & Symmes, for respondents John M. Beverly *et al.;* Wm. Scott Stewart, Henry E. Jacobs, John B. King, and John S. Hall, *pro sese;* Daniel V. Gallery, (William J. Corrigan, of counsel,) *pro se;* Al F. Gorman, (Anthony J. Schmidt, of counsel,) *pro se;* Eugene L. McGarry, (Thomas J. Symmes, of counsel,) *pro se;* Justus Chancellor, and Carl H. Lundquist, for respondent Carl H. Lundquist; James Hartnett, and Victor I. Ohrenstein, for respondent Victor I. Ohrenstein; Everett Jennings, John R. Fitzgerald, and Thomas P. Grant, for respondent Thomas P. Grant; James J. Barbour, for respondent Stephen A. Malato; James J. Danaher, for respondent John C. Garriott, Jr.; George W. Miller, Angus Roy Shannon, and Grover C. Niemeyer, (James Hamilton Lewis, of counsel,) for respondent Maclay Hoyne; Philip J. O'Mahony,

for respondent John R. Horan; FYFFE & CLARKE, (COLIN C. H. FYFFE, and JOHN HARRINGTON, of counsel,) for respondent Roy J. Egan; GEORGE A. COOKE, and ROSE & SYMMES, for respondent George H. Mason; FRANK P. ZALESKI, for respondent Leo V. Roeder; JUSTUS CHANCELLOR, and SUMNER C. PALMER, for respondent Mark J. McNamara; THOMAS D. NASH, and MICHAEL J. AHERN, for respondent James J. McDermott; ALTHEIMER & MAYER, (GIDEON S. THOMPSON, of counsel,) for respondent Meyer D. Kaufman; JACOB G. GROSSBERG, for respondent Sidney Lyon; JOHN T. RICHARDS, for respondent William S. Newburger; and HOPKINS, STARR & GODMAN, (ELWOOD G. GODMAN, and MARCUS WHITING, of counsel,) for respondent David S. Chesrow.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an information filed, on leave granted, by the People, on the relation of the Chicago Bar Association, against fifty-six members of the bar practicing in Cook county. The charges therein arise out of the employment of these various members of the bar by the Sanitary District of Chicago during the period between July 1, 1925, and December 31, 1928. The information charges that these attorneys are guilty of malfeasance in office as members of the bar of this court. It charges that two of the respondents, while acting as attorneys for the district, acquiesced in the placing of an excessive number of lawyers on the payroll of the law department of the district and in payment to them of salaries grossly in excess of the value of their services to the district, thereby permitting fraud to be perpetrated on the public. Fifty-four are charged with having received salaries from the district without rendering adequate or substantial services therefor. During the pendency of the cause four of the respondents died, and as to them the proceeding is abated. Answers having been filed, the cause was referred to Hon. Thomas Taylor, judge of the

circuit court of Cook county, as commissioner, to take evidence and report the same together with his conclusions and recommendations. The commissioner took evidence and filed his report. Exceptions were filed thereto by various respondents, and by the relator as to certain recommendations, and briefs and arguments have been filed in this court.

As to the fifty-four respondents the commissioner's report recommends the disbarment of eight, the suspension for two years of eight, the suspension for one year of eleven, the censure of seventeen and the discharge of the rule as to nine. As to respondent Edward H. Luebeck no recommendation was made but the commissioner asks for further instructions. The commissioner recommended that the rule be discharged as to respondents Hector A. Brouillet, Samuel J. Graff and A. Paul Holleb. The relator having filed no exceptions to the commissioner's report as to them, it is affirmed and the rule as to them is discharged. The remaining six as to whom the commissioner recommends discharge of the rule are John B. King, Eugene L. McGarry, William Scott Stewart, Charles F. Brown, John M. Lowery and John R. McCabe. The relator has filed exceptions concerning the finding and recommendation of the commissioner as to these respondents but to the recommendation concerning the last three no briefs have been filed. Those respondents as to whom the commissioner recommends disbarment are as follows: Frank J. Brewbaker, Kleofas Jurgelonis, Stephen A. Malato, Harry Mantell, Adam E. Patterson, Joseph E. Paulissen and George H. Mason. Respondents Mantell and Paulissen filed no answer to the information and were found to be in default. Those as to whom the commissioner recommended suspension for a period of two years are Arthur Donoghue, Daniel V. Gallery, John C. Garriott, Jr., Thomas P. Grant, Maclay Hoyne, Henry E. Jacobs, Nathan A. Lawrence and Medard A. Kunz. The commissioner recommended that the follow-

ing respondents be suspended for a period of one year: Harry J. Berman, David S. Chesrow, Al F. Gorman, Joseph A. Kolb, Philip A. Lozowick, Carl H. Lundquist, Mark J. McNamara, G. Edwin Mitchell, William S. Newburger and Victor I. Ohrenstein. The last named respondent filed no briefs supporting his exceptions to the commissioner's recommendation. As to the following respondents the commissioner recommended discipline by censure: John M. Beverly, John J. Dillon, Robert H. Eberle, Roy J. Egan, John F. Higgins, Meyer D. Kaufman, Edward P. Luczak, Sidney S. Lyon, Arthur F. Manning, James J. McDermott, Abraham L. Missner, Leo V. Roeder, Augustus L. Williams, Eugene M. Hines, John R. Horan, John S. Hall and Ivor L. Smith. The four respondents last named filed no briefs in support of their exceptions to the commissioner's recommendation.

The charge in the information as to all respondents except Hoyne, Brouillet and Garriott is that they took the funds of the sanitary district in the form of salary as assistant attorneys for the district which they knew they had not earned, when the number of lawyers so placed on the pay-rolls was grossly in excess of the number necessary to carry on the work of the law department of the district. As to certain of the respondents the charge is that they did not render adequate services for the money paid them, and as to others it is charged that they rendered no substantial services for the salary received from the district. The charge against Hoyne and Brouillet is that they acquiesced in the placing on the pay-rolls of the district of many unnecessary attorneys. The charges as to respondent Garriott do not fall strictly in either class, since he is not charged with having received moneys of the district but procuring the payment of salary in the name of his brother-in-law, who, it is charged, rendered no service whatever to the district and did not know his name was on the pay-roll until the pay check was delivered to him.

A large amount of evidence was taken by the commissioner, which is analyzed in an extended report filed by him. These charges, because of their similarity as to the different respondents, and in order to avoid much repetition in the record, have been joined in one proceeding. They naturally fall into two classes: those attorneys charged with receiving the moneys of the district without rendering any services or grossly inadequate services therefor, and the case of Hoyne, whose alleged acquiescence in placing an excessive number of lawyers on the pay-roll of the law department is declared to have made possible the defrauding of the public and the misuse of public funds.

We shall first consider the charges against those respondents other than Hoyne. In order to avoid injustice which might otherwise result to some of the respondents if treated as members of a class, it is necessary to consider the charges against each separately. In so doing we will first consider those recommended for discharge by the commissioner and as to which recommendations the relator has filed exceptions but no briefs in support thereof. These are Charles F. Brown, John M. Lowery and John R. McCabe.

Respondent Charles F. Brown was at the time of the hearing forty-two years of age. He was admitted to the bar in February, 1913. He was employed by the sanitary district as an assistant attorney from June 15, 1927, to December 31, 1928, at $5000 per year. He received a total of $7708.21. His appointment was made on the recommendation of a political friend. It was understood that he did not want a full-time job. He was assigned a desk. A few days later he was sent to Springfield to lobby on tax matters. He examined some releases, prepared a brief in a damage case, wrote opinions and worked on claims and some compensation cases. It appears that as a result of his service in the World War he was a partial paralytic and that he therefore did not desire full time. He testified that he thought he was rendering services adequate for the

compensation paid him. The commissioner found that he was not consciously blameworthy or willingly guilty of any dereliction in his relations to the sanitary district. Relator objects to this finding and recommends that he be censured. From an examination of the evidence we are unable to find that the record contains proof of dereliction on his part, and the recommendation of the commissioner is affirmed.

Respondent John M. Lowery, as to whom the commissioner also recommends discharge of the rule, was fifty years of age at the time of the hearing. He was admitted to the practice of law in 1911 and since that time conducted a practice of general nature. He was employed by the sanitary district as an assistant attorney from February 15, 1928, to November 15, 1928, at $6000 per year, receiving $4500. He was appointed through the recommendation of Timothy J. Crowe, president of the board of trustees of the sanitary district, who asked him if he would like to try some cases for the district. He asked for some time to clean up his work, and went to work for the district in 1928. Crowe gave him a letter of employment, which he took to the chief clerk of that department. He was assigned cases in the service known as the "overflow department," hereinafter described. He prepared briefs, performed office work and spent most of his time at the district office. The commissioner found that he appeared every workday and remained from nine in the morning until three in the afternoon, during which he performed legal services for the district and was there to do any work that might be assigned to him. The commissioner finds that the evidence fails to make out a case of professional misconduct. The relator recommends that he be censured. We have examined the evidence as to the charges of malfeasance against this respondent and are of the opinion that it does not support them, and the report of the commissioner as to him will be affirmed.

Respondent John R. McCabe, as to whom the commissioner also recommended a discharge of the rule, was at the time of the hearing fifty-one years of age. He was admitted to the bar in 1901. He was employed by the sanitary district between October 1, 1927, and December 31, 1928, at the rate of $6000 per year. He testified that he received information by telephone from the sanitary district, that Crowe, the president, wanted to see him. In response to that information he called at the office of the district and was told by Crowe that he, Crowe, would like to have him on his legal staff. Respondent stated he could not give full time, to which Crowe agreed. It appears that he was told by Crowe that he would be expected to assist in the matter of legislation affecting the sanitary district while the legislature was in session. The chief clerk of the legal department told him that he would hear from him as to assignments. He attended most of the board meetings, as he was told to do. He advised with president Crowe, drafted ordinances, advised as to contracts, examined papers pertaining to easements and bonds and studied the Drainage act. In this and other work he spent about twelve hours a week at the district offices. In this he is corroborated by other witnesses who were among the regular lawyers of the district. The commissioner found that the evidence did not warrant discipline of this respondent, as it did not show unprofessional conduct on his part. Having examined the record as to these charges we are of the opinion that the conclusion of the commissioner is thereby supported, and the report as to this respondent is affirmed.

We come next to the record affecting the respondents as to whom the commissioner recommended disbarment or discipline and the three respondents as to whom the commissioner's recommendation of discharge of the rule is contested here by the relator. While each case has received the separate consideration of the court, it is necessary that, so far as can be done, the charges and defenses

thereto being similar, they be treated as a group, though the application of the defenses herein discussed has been considered as to each separately. The points that have been raised by these respondents are: (1) Insufficiency of proof; (2) no showing of motive; (3) since the respondents were under contract with the district their act in taking the money of the district cannot be made the basis of a charge of unprofessional conduct; (4) the information seeks to establish a new standard of conduct which, if adopted by this court, should not be applied retroactively; and (5) that the several respondents are improperly joined in one proceeding. The last point was considered by this court when the application for leave to file the information was under consideration. This proceeding is not a lawsuit, with the formalities of common law pleading and judgment. It is an investigation of the conduct of certain members of the bar for the purpose of determining whether they shall be disbarred or disciplined. To have filed fifty-six separate cases would have involved a great deal of additional expense and time on the part of the relator and the respondents. As we have indicated, the charges against each individual have been considered separately.

There are certain facts about which there is no dispute and which equally affect all respondents. The Sanitary District of Chicago is a municipal corporation, created by an act of the legislature in 1889. It is managed by a board of nine trustees. It derives its income from taxation. Under the statute the board of trustees has the power to elect an attorney and certain other officers, to hold their respective offices during the pleasure of the board. The board may prescribe the duties and fix the compensation of all officers and employees of the district and adopt rules concerning the conduct of the business of the district. Shortly after its organization it began the construction of a drainage canal, by which it reversed the course of the Chicago river, with the result that it, instead of flowing into Lake Michi-

gan, now flows into the Illinois river basin. Lake Michigan thus became a source of the Illinois river. This reversal of the direction of the waters of the Chicago river was permitted in the interest of the health of the city of Chicago. The quantity of water sent through the sanitary district canal from Lake Michigan and tributaries of the Chicago river into the Illinois river was large and so raised that river that overflows occurred. As a result a very large number of suits and claims for damages were filed against the sanitary district by owners of overflowed land lying near and adjacent to the banks of the Illinois river. These suits were to recover damages to lands, crops, cattle, and other property. Many suits were tried throughout the Illinois valley but as late as 1925 many yet remained undisposed of. During that year a commission of three county judges was appointed under an ordinance of the sanitary district to hear such claims and make awards thereon, the same to be paid by the district if it approved them. Many claims were thus disposed of. This commission was later abolished, leaving many suits and claims still pending against the district. Suits were also filed against the district, arising out of proceedings before the commission.

In 1925 claims were actively made by the States bordering on the Great Lakes that the diversion of the water from Lake Michigan through the sanitary district canal was causing damage to the shipping on those lakes by the lower lake levels, and there was filed in the Supreme Court of the United States a proceeding to enjoin this diversion of water. This litigation was in charge of ten special attorneys for the district employed for that purpose. None of the respondents were actually engaged in that suit though some worked on phases of that litigation. The Illinois valley claims, or overflow cases, as they came to be known, were in charge of a staff of lawyers eleven in number, and in addition local attorneys were engaged when cases were tried. A number of these respondents were assigned to overflow

cases, but it is charged in the information that they rendered no adequate services in these or other legal matters of the district.

Over eight hundred suits for damages were filed in the different counties along the Illinois river, arising out of floods alleged to have been caused by the flowage through the district canal. Of these suits many were still pending during the period covered by these charges. However, from 1926 to 1929 but two of these suits were tried. The district was represented before the Illinois Valley Claims Commission by members of the regular legal staff having charge of overflow cases. The two cases tried during this period were the Coal Creek Drainage and Levee District *vs.* Chicago Sanitary District, and Christie *vs.* Chicago Sanitary District. Other overflow cases were not tried because of an agreement among counsel that they should await the outcome of the Coal Creek and Christie cases. After verdict in the Coal Creek case against the district in 1926, counsel in charge of that litigation wrote to Brouillet, then attorney for the district, advising that the legal department "mobilize their trial lawyers" to guard against the possibility of numerous demands for immediate trial in the circuit courts of the counties along the Illinois river. Brouillet thereupon furnished a list, including the names of eight lawyers in different parts of the Illinois river valley, who were available for these cases. Their employment was quite apart from the appointment of the respondents as assistant attorneys. While there had been a call for additional lawyers, the record shows that the trustees and the attorneys knew that there were a comparatively few counties in which suits were filed and therefore but a small number of courts available to try them.

It appears from the record that the district used three methods of payment for the services of members of the law department. One was by voucher, another by the regular pay-roll, and a third by a miscellaneous pay-roll. The

regular pay-roll included those holding positions enumerated and provided for in the annual budget. Those holding positions not set out in the budget were carried on the miscellaneous pay-roll, while attorneys rendering special service to the district were paid by voucher. Under the rules of the board the head of the legal department was required to certify twice each month the list or pay-roll of employees in his department. These lists were made up by the chief clerk of the law department from letters of employment. The regular pay-rolls, in consolidated form, were printed monthly. The miscellaneous pay-rolls were not published and did not appear in the records of the proceedings of the board, although at the end of the year the clerk's annual report showed the names of all employees and totals paid to them. From January 1, 1926, until November, 1928, there was a rapid increase in the number of lawyers employed by the district. In 1925 there were 19 lawyers on the regular pay-roll and 25 at different times on the miscellaneous pay-roll. In 1926 there were 33 lawyers on the regular pay-roll and 30 on the miscellaneous pay-roll. In 1927 there were 44 on the regular pay-roll and 71 on the miscellaneous pay-roll. In 1928 this employment of lawyers reached its peak, there being 41 lawyers on the regular pay-roll and 99 on the miscellaneous pay-roll, or a total of 140 lawyers employed during that year. Not all were employed throughout the year. As we have stated, the regular pay-roll contained only the names of those lawyers provided for in the regular budget. The amount of money paid out by the district to the assistant attorneys who are respondents herein was in 1925, $7024.07; in 1926, $32,-061.88; in 1927, $85,919.54; in 1928, $196,410.79, making a total for four years of $321,416.28. This was in addition to the regular pay-roll as shown by the budget and in addition to the special appropriations for the services of attorneys in the lake levels and overflow cases. This last mentioned group were paid by vouchers. In 1925 payments

to them amounted to $103,333; in 1926, $162,129; in 1927, $219,202; in 1928, $103,827. There is no contention that the number of lawyers was not grossly in excess of the number necessary to carry on the work of the department. Many of these respondents secured their appointment through the political influence of members of one or the other of the major political parties.

While it is not charged that fraud was practiced by any of the respondents in the procurement of employment, it is argued that they became aware that their services were not necessary and that it became their duty to then withdraw from that employment, and that their failure so to do amounted to knowingly taking the moneys of the district without rendering adequate services therefor. Respondents are represented by numerous counsel who have separately presented briefs for their client or clients. These briefs present, in one form or another, the question whether there exists in this State any standard, heretofore recognized, by which the professional conduct of the respondents may be gauged in this proceeding. Counsel for the respondents argue that there has never been a case where this court, or any court, has disbarred or otherwise disciplined an attorney under facts and charges such as are here presented. They cite the rule frequently announced by this court that an attorney will be punished for unprofessional conduct only where the case is clear and free from doubt, not only as to the act charged but also as to the motive, (*People* v. *McCaskrin,* 325 Ill. 149; *People* v. *Baker,* 311 id. 66; *People* v. *Hickman,* 294 id. 471; *People* v. *Harvey,* 41 id. 277;) and urge that as there can be no motive to violate a standard when no standard has been set up, no punishment of the respondents can be had in this case. They say that to now announce a standard of professional ethics which would require disbarment or discipline and apply it to any of the respondents would be to apply such standard retroactively. Counsel for relator reply that the already prevailing stand-

ards of conduct for members of the profession do not permit a lawyer for a municipal corporation to accept pay in public funds for many months without rendering adequate services in exchange therefor, and cite Canons 12, 15 and 32 of Professional Ethics adopted by the American Bar Association. It may be readily seen that whether such a case as this has previously been presented to a court does not necessarily affect the question whether standards exist by which the conduct of lawyers may be gauged. Counsel agree that no such case has heretofore come to the attention of any court. It is conceded that most of the respondents were appointed through political sponsorship. Each knew the amount of service he was rendering. Each had some judgment as to whether he was giving substantial *quid pro quo*. It is not, and should not be, necessary that there be laid down specific rules of conduct where a question of professional integrity is involved. A lawyer, by reason of his training, is to be charged with the knowledge that his client, whether an individual or a municipal corporation, relies, and has a right to rely, upon his good faith. Where, as here, the actual client of the attorney is not a board of trustees but the public who pay his fees, the attorney knows that he is charged with responsibility for fair dealing not only with the trustees but likewise the public. Were an information to charge only that respondents had received more compensation than the value of their services warranted, a different case would have been presented. There would then be opened a field of investigation vague and difficult of delimitation. The various elements entering into the value of professional services make it difficult to decide such a question with nicety. In the case of a private contract, where only the party contracting with the lawyer is to pay the fee, it may be said that it is only when the compensation received is, under the circumstances of the employment, so patently and grossly beyond reason as to evidence an overreaching of the client that

courts will interfere with the contract or say that the receipt of such fee by an attorney may be considered unprofessional conduct. On the other hand, where his salary is not to be paid by the individual who employs him but paid from the public treasury or a trust fund, and little or no services are rendered, and it appearing to him, upon reasonable reflection, that no substantial services will, under the circumstances, be required of him, the common conscience is sufficient to set up a standard of ethics and to warn the recipient of such salary that he is taking that to which he is not entitled and cannot honestly accept, no matter what may be his contract. An attorney under such circumstances may not plead the shortcomings of the individuals or officials who thus wrongfully contracted with him, for he must be held to realize that if he knowingly continues in such wrongful contract he becomes a party to the wrong. Particularly is this true with the lawyer, since his understanding and training prompt him to an earlier inquiry and aid him in more quickly detecting the wrong. The charge here is that the respondents, with reason to believe that adequate services would not be required or expected of them, continued to thus take public funds knowing that they were violating their obligations, as attorneys, to deal fairly. The thing involved here is not the right of a tax-payer or the sanitary district to recover the salaries paid, but the professional conduct of those who, as members of the legal profession, are particularly charged by the ethics of that profession with a duty to deal fairly with their clients. Neither common law pleadings nor the common law rules governing the entries of judgments are applicable to a proceeding of this character. (*Boston Bar Ass'n* v. *Casey,* 211 Mass. 187.) Nor may technical legal defenses be called upon to aid in response to a charge against one's professional integrity where the accused knows that notwithstanding a technical defense his conduct was ethically and morally without support. Few rules could

more directly tend to bring the legal profession and the courts into disrepute than one permitting the lawyer, trained in legal technicalities, to use that training to deal unjustly with others and then urge such defense on an inquiry as to his good faith in such dealing. Fair dealing, whether it be with an individual or the public, demands *quid pro quo* of the lawyer, and though he should not be penalized for an erroneous exercise of judgment, yet he must, if the standards of the profession be maintained, be held accountable where it is apparent that his act was one of self-interest, directed against the interest of his client. Canons of ethics and rules of professional conduct laid down by courts ought not be necessary to point out as prohibited that which the average intelligent lawyer knows is not fair dealing. If this be not true, then the pronouncements of the courts and the leaders of the profession that the lawyer is held to a high order of integrity become meaningless platitudes. The fact that a lawyer may have considered it ethical to take public funds without giving any substantial service therefor when it is patent to the average mind that it was not, can scarcely be said to constitute an impressive defense of good motive in answer to a charge leveled against his professional conduct. Though these respondents may not have known, when employed, that the pay-rolls of the sanitary district were loaded with useless attorneys, yet if they came to know that such was true, the fact that they had a contract with the district could scarcely have satisfied their own conviction as to the propriety of their remaining on that pay-roll. While it is true, as urged by counsel for respondents, that an attorney under these charges is entitled to be judged by the circumstances under which he acted and not under what was later disclosed, (*United States* v. *American Bell Telephone Co.* 167 U. S. 224; *Briggs* v. *Spaulding,* 141 id. 132;) yet where the circumstances were such as to indicate to a reasonable man that his employment was unnecessary and that he was receiving compensa-

tion without substantial services rendered, the duty upon him to withdraw became plain, and the fact that the trustees were consenting to the payment of unearned salaries does not show the lawyer blameless who accepted them. (*People* v. *Gilbert*, 263 Ill. 85.) A lawyer who twice each month, for many months, takes a salary from the public knowing that he has rendered no service at all or no substantial service therefor is guilty of a breach of his duty to the public. It is, of course, true that no criticism can attach to a failure to render services because of illness, if there is need for the services and they can be rendered by others without further expense to the client. In what we have here said no new standard is set up, nor is it necessary to set up a new standard of legal ethics in this case. These respondents are to be judged by the standards of common honesty and fair dealing, which are not new but are as old as the profession. The Canons of Ethics of the American Bar Association referred to remind the lawyer that the legal profession is a branch of the administration of justice and not a mere money-getting trade. (Canon 12.) The lawyer must obey his own conscience and not that of his client. (Canon 15.) "A lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty as an honest man and as a patriotic citizen." (Canon 32.)

It has been the rule in this State for many years that courts are not bound by the opinions of attorneys as to what constitutes reasonable attorneys' fees but are responsible to litigants for the use of their own knowledge of the value of such services, and ought to, and will, take into consideration such knowledge. (*Gentleman* v. *Sanitary District*, 260 Ill. 317; *Metheny* v. *Bohn*, 164 id. 495; *Goodwillie* v. *Millimann*, 56 id. 523.) The fact that the sanitary district and the respondents were competent to enter into a contract may be admitted, but, obviously, such capacity cannot be urged as a defense against the charge that the

attorney so contracting has been guilty of participation in the wrongful use of public funds where it may reasonably be said that he came to know that the contract he had made was one to which he ought not, in good conscience, remain a party. We are of the opinion that there exist, and have existed through the Canons of Ethics and the common conscience, sufficient standards to direct the attorney in all cases of this character not involving honest error in judgment, to which, of course, all are liable.

Counsel argue that to disbar or discipline respondents in this case would, in effect, be making retroactive application of such rule of conduct as may be announced in the case, and that, therefore, no punishment should be imposed. It has been frequently announced by this court that conduct of a lawyer which is dishonest or violative of private rights or public good is punishable in proceedings of this character. (*People* v. *Baker, supra; People* v. *Hickman, supra.*) If, when gauged by these standards, the attorney's conduct is such as to subject him to discipline, such discipline is not retroactive merely because no similar acts have previously passed under judicial scrutiny. The fact that many others were engaged in similar acts, or that a certain public apathy exists as to such conduct, if it does exist, affords no justification to one shown guilty of such charge. It would, indeed, be most dangerous to approve such an excuse.

Counsel argue that none of these respondents was under a duty to investigate the reason for failure to assign work to him or the conditions existing in the law department, and since they did not know such conditions they cannot be criticised for waiting for work. All of this was true when the employment began, but certain facts must have presented themselves to each of those respondents who gave little or no services for his salary. He knew that public funds were being paid to him without a just return. He knew that there was little or nothing for him to do. When his request for work brought nothing for him it must have

become apparent to him that he was being paid for services he did not render. These were sufficient to provoke inquiry into the conditions existing in the legal department which would have disclosed compelling reasons for his withdrawal from such employment. If such respondents had seriously undertaken to find out what was going on in the law department so far as the prospect of rendering substantial service was concerned, it seems clear from this record that they could have discovered that their services were entirely unnecessary. It may not be said in their defense that they, under such circumstances, waited for work without realizing the injustice of taking the public funds without return therefor. Attorneys are officers of the court and as such are charged with a duty to avoid conduct tending to bring the profession into disrepute. (*People* v. *Moutray*, 166 Ill. 630; *People* v. *Czarnecki*, 268 id. 278; *People* v. *Gorman*, 346 id. 432.) In all cases where it appears that the attorney is an unsafe or unfit person to be trusted as an attorney, this court has the power, and it is its duty, to strike his name from the roll. (*People* v. *Meyerovitz*, 278 Ill. 356.) Unprofessional conduct in a lawyer is that which violates the rules or ethical code of his profession or which is unbecoming a member of that profession. (*People* v. *Berezniak*, 292 Ill. 305.) The standard of professional integrity which has been applied and should be applied to those admitted to the practice of law is not satisfied by such conduct, merely, as enables them to escape the penalties of the criminal law. (*People* v. *Macauley*, 230 Ill. 208.) The standards governing attorneys who occupy public office are, after all, but statements of the rule of common conscience and fair dealing.

Respondent Harry J. Berman was forty-eight years of age at the time of the hearing. He was admitted to the bar in 1914 and was on the sanitary district pay-roll as assistant attorney between August 1, 1927, and November 15, 1928, at $5000 per year. His appointment was on a

part-time basis and was procured through political friends. He was told there were no cases to assign to him then but that he would be notified. On September 22 of that year two cases were assigned to him which he watched when on call in court. He looked up law. Officials above him in the district told him that these cases would not go to trial. When called upon for a report in detail of the work he had done he stated that he had watched the two cases until April 28, and that this was all the services he performed. He testified that a law clerk could have done what he did but it was not the work that he expected to do and desired to do. Numerous witnesses in connection with the law department testified that they had no knowledge of work that he did, some testifying that he had no valley cases but did other work. The commissioner found that he rendered practically no service for the salary paid him, yet he persisted for fifteen months in drawing a salary at the rate of $5000 per year. The commissioner recommended that he be suspended for a year. Able briefs have been submitted on behalf of this respondent urging that to discipline him would be to make retroactive application of new principles. As we have stated, we cannot agree that the principles involved in this case are new but rather that they are as old as the profession itself. The exercise of good faith in the interest of the client has always been required of lawyers. It is clear that respondent Berman must have known that there was no justification for his taking this salary after it became apparent to him, as it surely did, that he was to render little or no service therefor. He is, however, entitled to consideration for the fact that he took the position originally in good faith. We are of the opinion, however, that his conduct merits discipline.

Respondent John M. Beverly was thirty-nine years of age at the time of the hearing herein. He was admitted to the bar in 1916. He was employed as assistant attorney for the sanitary district from January 16, 1926, to Decem-

ber 31, 1926, and from March 1, 1927, to April 30, 1927, at $4800 per year. He secured employment by aggressive political pressure. No duties were assigned to him at the time of his employment. He states that the service required of him consisted largely in holding himself in readiness to answer any court calls to which he might be assigned. He put in two or three afternoons a week examining files, sometimes working in mornings. He asked for more work and was promised some but received no more. He was assigned to one case of considerable importance. The commissioner found that his work for the district was negligible and that his testimony demonstrated that he realized the services he actually rendered were not adequate, and this is evident. This respondent was frank in his statements. The situation was such, however, as to indicate most strongly to him that he should not continue in the service. His so doing subjects him to discipline.

Respondent Frank J. Brewbaker was forty-six years of age at the time of the hearing. He was admitted to the bar in 1922. He stated that he had had a general office practice, though not much court work, during the last five years. He was employed by the sanitary district from September 16, 1927, to November 15, 1928, at $3600 per year. During that time he was also employed by the American Railway Express Company. He stated that that work did not require much time but that the express company probably paid him $150 to $160 per month. He was appointed by letter of president Crowe. He testified that Hoyne, attorney for the district, told him about the general history of the legal situation of the district and gave him some pamphlets, telling him to familiarize himself with the affairs of the valley, and that there were many cases pending and respondent would be expected to be sufficiently familiar with them to assist in their trial. He stated that nothing was said about putting in his full time for the district. He stated that he studied the laws pertaining to

the district and made some trips down through the Illinois valley, usually one-day trips on week days. He made no report of his services and none was required. He testified that he was at the district office at various times and would be given cases to study; that he looked at some leases but made no reports. He testified he prepared on fifteen or twenty cases in Brown or Schuyler county but left no memoranda in the office, and that he had read the records in the Coal Creek case and quite a lot of engineering data. He testified that in the first two months he put in one-half his time, doing part of the work at the district office and part at his office. J. S. Smith, claim accountant for the express company employing respondent, testified that respondent's work for that company consisted in auditing loss and damage claims paid by the company's claim agents; that his work was done at a desk in the office of the company and occupied respondent's entire time; that his required time was eight hours per day except Saturday, which was four hours; that he was paid $172.62 per.month, and that during the period from September 16, 1927, to November 15, 1928, respondent was absent from his work thirteen and one-half days, part of which was spent on a vacation in Colorado, and that an additional week was added to this at his request and without pay. This witness testified that during these thirteen and one-half days respondent asked to go to Effingham to visit his father and requested half-fare transportation from Chicago to Effingham and return, which was delivered to him November 3, 1927. Smith testified that he did not know that respondent was practicing law until the sanitary district investigation. Four of the regular attorneys for the district did not recall his service for the district. Respondent testified the amount paid him was fair and reasonable. Smith's testimony was not contradicted, and shows not only that this respondent did not give any appreciable service to the district but in addition was paid for full time by the ex-

press company. The testimony of the respondent as to work he did for the district was not worthy of belief. The commissioner recommended that he be disbarred. To his conduct in accepting pay for services he did not render, it appears that he has added the more serious offense of testifying falsely as to his relations with the district, thereby showing himself guilty of conduct which tends directly to bring the legal profession into disrepute. His counsel argue that the rule should be discharged, basing their argument principally on the fact that he had a contract with the district, and therefore, in the absence of complaint from the district, he is not to be held to accountability for his action in that connection. This record shows that he was put on the pay-roll as a matter of political patronage. He did no useful work but employed his time entirely in another occupation from which he received compensation. He undoubtedly knew that he was rendering no service of value to the district. In addition to that he testified falsely on the witness stand, and this fact, while not of itself a part of the charge, demonstrates a serious unfitness to practice law and constitutes ground for disbarment, which this court cannot refuse to consider. (*People* v. *Gorman, supra.*) The commissioner recommended that he be disbarred, and that report should be affirmed.

Respondent David S. Chesrow was twenty-nine years of age at the time of the hearing. He was admitted to the bar in 1926 and was employed by the sanitary district as assistant attorney from January 22, 1927, to April 30, 1927, from May 10, 1927, to September 15, 1928, and from October 1, 1928, to November 30, 1928, at the rate of $3000 per year. He was employed by letter of president Crowe. When he reported he was told by the chief clerk what work he would be assigned to. He reported five or six times before receiving a letter advising him that he was assigned to lake levels litigation. This was a month after he was put on the pay-roll. In May or June, 1927, he was assigned

to valley cases. He had had no work before this assignment. Six cases pending in Pike county were assigned to him. He studied the declarations, made briefs, and did work on other questions of law arising in the district which were assigned to him. He made some trips down into the district pertaining to the work he was assigned to do. He presented a schedule showing the hours he put in. He stated that he thought the amount paid him was reasonable. Witnesses were called in his behalf who testified that they thought the fees paid him were reasonable and who testified to his good professional reputation. His counsel argue that the commissioner should have dismissed the charge as to him on his sworn answer and erred in finding that he had rendered inadequate services for the compensation paid him. It is sufficient answer to the first contention to say that the commissioner had no power to dismiss or discharge any of the respondents. He could but make recommendations. Other arguments were presented of the character heretofore considered in this opinion. It is earnestly argued that respondent had no dishonest motives or intention to defraud the sanitary district. This court is not bound by the opinions of attorneys as to the value of their services. (*People* v. *Gilbert, supra.*) The record does not show any results of value accruing to the district by reason of the time which he says he devoted to its work. It is evident that his estimate of the hours he put in is not supported by proof as to his services rendered. It is clear that, while taking as salary the sum of $5378.96 during the period of the twenty-two months, he did not discharge his duty to his client and should be disciplined.

Respondent John J. Dillon was thirty-two years of age at the time of the hearing. He was admitted to the bar in 1925 and was employed by the sanitary district as assistant attorney from August 5, 1927, to October 2, 1928, at $5000 per year. He was told by the president, when appointed, that they expected a lot of lawsuits on the val-

ley claims and that he would have to put in the greater portion of his time in preparation for those suits. He was told valley cases would be assigned to him. He testified that certain cases were assigned to him. He examined titles for the district. He testified that he put in twenty hours per week at the district, and that he had some private business but did not allow it to infringe on the time needed for the district. The record shows that the work he did was largely that of a law clerk, for which he drew a salary of $5000 per year. It is not clear from his testimony that he appreciated during the time of his employment his true situation. The record against him is not sufficient to justify disbarment or suspension but his conduct is subject to discipline.

Respondent Arthur Donoghue was fifty years of age at the time of the hearing. He was admitted to the bar in 1897 and engaged in general practice for the last ten years. He was a member of the State Board of Equalization in 1912, assistant corporation counsel for the city of Chicago from 1924 to 1926, assistant State's attorney from 1926 to 1927, and was employed by the sanitary district as assistant attorney from March 16, 1928, to November 30, 1928, at $5000 per year. Employment was secured for him by a man by the name of Lyman. He went to the office daily for several months. He testified no work was specifically assigned to him but he was told "to look up some stuff." He did not state what he was to look up. He testified that he looked up a number of things for himself—had become interested in some things that were going on around there. He stated that Elmer J. Whitty, one of the regular officers of the department, wanted to assign him some cases, but that he replied that he understood there was not anything to be done about them except try them, so there was not much use putting in a lot of time until he knew they were ready for trial. No work was assigned to him after the fourth month. He testified he was told

there were a lot of cases to be tried but to keep quiet. He remained on the pay-roll five months thereafter. Five of the regular lawyers of the district testified they had no information as to his work, though Whitty stated on cross-examination that he had some valley cases. He states that he did what he was told to do. The first three or four months he was there from nine until noon, except Saturdays. After that he reported three or four times a week but no work was assigned to him. He states that it was his agreement with his client that he was to do what he was called on to do. It is clear this respondent, who was on the pay-roll for eight and one-half months at $5000 per year, realized that he was rendering no valuable service to the district. It was therefore his duty to the public to withdraw from that employment when he saw that there was, in fact, nothing for him to do. He was a lawyer of experience and knew his obligations to the public. His excuse for his conduct was that he was willing to work. Such conduct, however, will not be allowed to escape discipline.

Respondent Robert H. Eberle was forty-two years of age at the time of the hearing. He was admitted to the bar in 1913 and since engaged in general practice. He was employed as assistant attorney for the sanitary district from June 16, 1928, to November 15, 1928, at $5000 per year. He secured his employment at the suggestion of political friends, who told him that the district had the kind of work he could help them on. President Crowe told him he probably would be given some work to do and would be paid $416 per month, with the understanding that he was to do trial work later in the fall. He testified he was assigned to trade waste cases to help attorney Thomas Marshall, but that Marshall never sent for him. He stated that he examined some leases and did preparatory work on valley cases, and that he worked during his summer vacation on the lake levels cases. He testified that he thought he did not receive enough for the services rendered; that his services

were worth $10,000, and that though he put in but an hour or two on each lease he examined, compensation for such services, if rendered to individual clients, would vary from $500 to $2500 for each lease. It appears from the record that at the time he was employed by the district he expected to render services and that he did what was assigned to him, which, however, was negligible. The criticism of his conduct lies in the fact that he must have realized before the expiration of the period for which he was employed that he was doing no work of value for the district. The facts in this case, though requiring discipline, do not justify his disbarment or suspension.

Respondent Roy J. Egan was thirty-three years of age at the time of the hearing. He was admitted to the bar in 1920. He served in the United States district attorney's office and as assistant corporation counsel, enlisted in the navy in 1918, and served in the officers' training school, for which he won a commission as an ensign. He was employed by the sanitary district between November 16, 1927, and November 30, 1928, at $3600 per year. Prominent citizens called as witnesses on behalf of respondent, testified to his good service, his industry and his good professional conduct. The evidence discloses that he did what he was told to do; that he put in a substantial amount of time in the study of law, making of briefs in valley cases and advising with officials in the legal department as to other matters arising there. He averaged about three days a week on the affairs of the district. He attended the meetings of the board. He kept a tabulation of his services rendered the district, which was offered in evidence. It appears from examination of the record that his motives were good. He stated that he thought he had earned his compensation; that if he thought he had not he should be glad to work out part of it and make restitution if he could. While we are of the opinion that this young man should have exercised more discernment and care to see that he rendered full value for

the compensation received, yet the record does not disclose delinquency on his part with the required clarity to justify discipline. The rule as to this respondent is therefore discharged.

Respondent Daniel V. Gallery was sixty-six years of age at the time of the hearing. He was admitted to the bar in 1893 and has been in general practice since. He was assistant corporation counsel for four years and was employed as assistant attorney by the sanitary district from March 16, 1928, to November 15, 1928, at $5000 per year. His appointment was secured through political influence. Nothing was said about the time he was to put in. He was put on the pay-roll and two weeks or a month thereafter told attorney Hoyne that he would like some work. He repeated this request at some time later. He made another request for work to one of the special counsel for the district, but no work was ever assigned to him. He stated that the amount paid him was insignificant for the services he expected to perform; that he expected to be retained in lake levels litigation. He does not, however, state the reason for that expectation. His argument is that he wanted to work; that the district had a right to employ him and that he had a right to accept the employment. He also argues that a lawyer employed by a public corporation is entitled to his salary if he is willing to work, regardless of whether any work is assigned to him, and that he had no duty to investigate the conditions in the law department. He states that he did not know that there was nothing for him to do. He was a man of mature years, who understood the duty resting upon a lawyer, and that, notwithstanding failure of the officers of the district to assign work to him, his duty to the public, whose revenues were paying him, was to refuse to continue in that service when it became evident to him, as it surely did, that there was no reason for his employment. It is clear that he is deserving of discipline.

Respondent John C. Garriott, Jr., was forty-one years of age at the time of the hearing. He was admitted to the bar in 1914 and was in the army in the World War about nineteen months. Prominent citizens of Cook county testified to the good reputation of respondent. The charge against him differs from that against other respondents in that he is charged with procuring the appointment of Hugh Miller, his brother-in-law, as an assistant attorney of the district knowing Miller would render no services. Miller testified he was never employed by the district, never visited the office, never did any work for the district and was never asked to do so. He stated he received one check for $150 dated September 15, 1927, at respondent's home, where respondent gave it to him; that he told respondent he did not want it, and respondent told him the check was for him. Miller's wife stated she would take the check, and after Miller endorsed it she did take it and cashed it. He also testified that respondent told him later that he had given in Miller's name as a matter of convenience because he did not know whom to recommend for the position and in order to hold it open until he could substitute another name. Respondent states in his answer and testimony that one Michael J. Connelly, a political ward committeeman of the eighth ward, requested him to get a job for a member of the organization, and that respondent asked president Crowe for a job and was told that it would be allotted and asked the name and address of the person to be put on; that respondent, not knowing whom else to suggest, gave the name of Hugh Miller, his brother-in-law, and that later the name of Frank J. Brewbaker, a respondent herein, was substituted, and that while arranging the substitution respondent was told there was a check at the office payable to Miller, and he secured the check and delivered it to him. He further testified that Connelly told him a member of the legislature was entitled to some jobs from the district, and that respondent asked Crowe for five jobs in Spring-

field in June, 1927, when the legislature was in session. He stated that he did not remember whether he signed the pay-roll to get the check payable to Miller but that Miller's name looked like his writing. He testified that he received no part of the proceeds of the check. No work was done by either Miller or Garriott. Later Miller delivered to the clerk of the district a cashier's check for $150 in re-payment for the one issued to him. It is clearly established that respondent had Miller's name put on the pay-roll as assistant attorney, received the check for $150 at the district office and took it to Miller, and had him endorse it in the face of Miller's statement that he knew nothing about the check and did not want it and that he did not need money at the time. It is also clear that at the time respondent made requests for appointments of the sanitary district the legislature was in session and contained bills affecting the interests of the district. There is no controversy as to the facts in this matter. This attorney must be held to have known that to seek favors of the district under such circumstances could not fail to compromise the good faith of his office as a member of the legislature. Respondent argues that the evidence does not show willful or corrupt professional misconduct; that lack of foresight is not ground for disbarment and that his conduct was not so gross as to justify disbarment. It is also argued that the conduct complained of, if it was misconduct, was not in his professional capacity. It is sufficient to say that in *People* v. *Wheeler,* 259 Ill. 99, *People* v. *Baker, supra, People* v. *Hansen,* 316 Ill. 502, and *People* v. *Gorman, supra,* misconduct outside the professional capacity of the respondent, involving legal ethics, was held to be sufficient ground for disbarment. There being no dispute as to the facts in this case, the question of discipline of this respondent depends entirely upon the effect of those acts which he admits. It is stated in the testimony given on the hearing as to this respondent that it had been the custom for members of the legislature to

apply for and receive appointments at the hands of the sanitary district. Quite aside from the question of the approval or disapproval of such custom if it existed, the facts here are that respondent had Miller's name put on the payroll, called for the check for him and induced him to endorse it and accept it for his wife, notwithstanding Miller's objection that he did not want to be so employed and did not want the check. Respondent knew that no consideration whatever was being given by Miller for the check and that Miller did not even have knowledge that his name was being put on the pay-roll. The reputation of an attorney for fair dealing is quite as important in his transactions outside his professional duties as it is within them. While this respondent has borne a good reputation and was apparently exercising what he thought was his right, as a member of the legislature, to secure positions for members of his party's organization, the facts remain that he was seeking favors of the district when legislation affecting it was contemplated or was pending before the legislature, and that it was directly through his procurement that $150 of the public funds was paid to the wife of a man who not only rendered no service to the district but who did not desire the appointment and did not desire to accept the check. Such conduct is not in accord with respondent's professional duty and requires discipline.

Respondent Al F. Gorman was fifty-five years of age at the time of the hearing. He was admitted to the bar in 1916. Previous to his admission to the bar he worked as an architect and had held various town and district offices. He was employed by the sanitary district as an assistant attorney from August 11, 1927, to December 31, 1928, at $6000 per year. He was recommended by friends with political influence. He reported to the office and was told he would be called whenever work was available and that he was to work on valley cases. As a result of this appointment respondent closed his private office and did not

practice law for himself during the entire time of his employment. He expected to put in full time for the district. He continued to appear at the office daily for a couple of weeks, but nothing was assigned to him. After six or seven weeks he was assigned six valley cases in Putnam county in which claims had been filed before the claims commission. He did nothing in connection with the handling of the claims, as other counsel took care of them. He states that he checked pleadings, analyzed reports of investigators, looked up evidence, examined records in cases that had been appealed and attended hearings of the claims commission. None of the cases which had been assigned to him were reached for trial and he did not appear in court. He had no other law practice but put in some time in real estate work aside from the time he put in at the district office. Various witnesses testified to seeing him at the office but none testified as to any other assignments made to him. The arguments of his counsel are in the main those heretofore discussed in this opinion. It seems clear, however, that the work he is shown by the record to have done required but a small fraction of the time he was on the payroll. His act in closing his private office indicated that he expected to be employed for a considerable period of time. He testified that he had been told his employment should be good for at least six years. It is not doubted that he wished to fulfill the duties of the employment which had been given him, but it is likewise clear that after the first few months it must have been evident to him that he was not rendering *quid pro quo* for the compensation paid him, yet he did not resign until late in 1928, after the investigation of the conduct of the legal department of the sanitary district was begun and a large number of assistant district attorneys were dismissed. His conduct in that behalf requires discipline.

Respondent Thomas P. Grant was thirty-eight years of age at the time of the hearing. He was admitted to the

bar in 1917. He enlisted in the World War in 1918 and upon his discharge therefrom in 1919 opened an office for the private practice of law. He was employed by the sanitary district as assistant attorney from October 15, 1927, to September 15, 1928, at $5000 per year. He put in the first ten days on duty around the office. No assignments were made to him. He was told he would be called when work was assigned. He became ill and necessarily spent three weeks in Excelsior Springs, Missouri. He testified that he had no work in October, November and December of 1927. He made requests for work in January and was assigned to valley cases. He put in five or six weeks studying the law and facts in those cases, which, as he states, were about alike. He received no other assignments. Other members of the legal department testified that respondent had valley cases and general condemnation work. He replied to the request of relator to fill out a questionnaire as to his services, that the services he rendered were privileged matters and that he had no duty to answer to the public. He testified that he considered his compensation was not adequate, because he lost business which was turned over to others. He testified that Whitty, one of the attorneys, told him there would be an avalanche of work and that they would have to work night and day to get from under. His defense is, principally, that the record does not show corrupt professional misconduct or that respondent did not render adequate services. The fact clearly appears in the record that he received salary at the rate of $5000 per year for eleven months; that he did nothing in the first three months; that he spent five or six weeks threafter in studying the law and facts pertaining to valley cases and then for six months more did nothing. It is clear that he should have secured work to do or quit the employment. It is doubtless true that having given up other practice he may have missed opportunities which would have paid him better. However, that was a matter for which the public,

for whom he was employed, was in nowise responsible and did not relieve him from the duty to withdraw from the employment by the district when he found that his services were unnecessary. He argues that he did not know there was an excess of lawyers or the condition in the legal department. He did, however, know that there was no work for him and that he was regularly receiving money for services he did not render. The duty rested upon him to withdraw from that service. His conduct, therefore, cannot be excused.

Respondent John S. Hall was thirty-eight years of age at the time of the hearing. He was admitted to the bar in 1917, during which year he enlisted in the navy and was commissioned an ensign. At the end of the war he was discharged as lieutenant, senior grade. He was employed by the sanitary district as assistant attorney from February 6, 1926, to November 30, 1926, at $3600 per year. He was at the district office daily and did the work assigned to him for an hour or so each day. He worked three or four months on an opinion as to the police power of the district, examined leases, worked on lake levels propositions and on ordinances. He worked for a month on the right of the district to construct tunnels under roads, attended all the board meetings, was assigned three or four overflow cases and prepared for trial. He read different works that were suggested to him by his superiors pertaining to the law governing the district. He was assigned some special litigation. The commissioner recommended that he be censured. He has filed no brief and argument in this court. His lack of appearance here indicates that he is satisfied with the commissioner's recommendation. That report will be approved.

Respondent John F. Higgins was fifty-one years of age at the time of the hearing. He was admitted to the bar in 1901, was assistant State's attorney from 1912 to 1917, and was employed as assistant attorney for the sanitary

district from January 1, 1926, to December 31, 1928, at a salary varying from $6000 for the first year to $9600 for the third. In 1926 he was assigned to the work of advising the president as to actions of the board presented for his approval or veto, worked on abstracts of title, worked on a proposed civil service bill, spending more than two months on it, and prepared other legislation. He attended the weekly sessions of the legislature in 1927, made two trips to Washington on lake levels matters, did various preparatory work for the special sessions of the legislature in 1928, assisted in preparation of the message of the president of the district, and attended to the procuring of property desired to be purchased by the district. He testified that in two of the three years he put in more time on his private practice than on the matters of the district, but as to the third year the reverse was true. The value of the services rendered by this respondent is difficult to measure. It is evident that he worked more or less continuously in matters which pertain to the work which fell to the legal department. Some of those services may have been very valuable while others were of little value. It is evident that he was depended upon by the district to assist in presenting to the legislature arguments for or against legislation pending there which affected the district. While there appears in his testimony a tendency on his part to enlarge upon the value of the services rendered, yet there is no accurate means by which this court can judge whether the services were of great or little value. There is no evidence that he did not attempt to do that which was assigned to him or that he did not render valuable service. We are of the opinion, therefore, that the record as to him does not justify discipline.

Respondent Eugene M. Hines was thirty-two years of age at the time of the hearing. He was admitted to the bar in 1923 and was employed by the sanitary district between February 1, 1927, and November 15, 1928, at $5000

per year. He sought employment in some legal capacity from the political committeeman of his ward and by that means procured employment with the district. He went to the district office daily and remained there sometimes an hour and sometimes longer, sometimes returning after lunch. He was assigned some tasks by his superiors. A few personal injury suits were assigned to him. He voluntarily returned $1500 of the salary he received, stating that he believed he earned the difference, although the amount returned was in part determined by his ability to make return. For this he is entitled to credit, though his act in so doing indicated that he believed that he had received more money than he was entitled to. The commissioner recommends that he be censured. Respondent has filed no brief and argument. It is quite evident that he realized he should have withdrawn from the employment by the district long before the termination of his employment and that his services were of no value to the district. Having filed no brief in this court it is probable that he is satisfied with the recommendation of the commissioner. The report will be affirmed.

Respondent John R. Horan was forty-two years of age at the time of the hearing. He was admitted to the bar in 1919 and was employed by the sanitary district from February 1, 1928, to June 26, 1928, and from August 1, 1928, to November 30, 1928, at $4000 per year. He received this employment through a ward committeeman. The president issued directions to "put Jack on the roll." He stated that Crowe told him that he could fit in and do some of the work they wanted done. Nothing was said as to what he was to do. He also stated that Alexander L. Brodie, chief clerk of the district, told him to come in and he would see if he could find something for him to do. He attended a hearing of the Industrial Commission concerning a claim of one of the employees of the district. He settled a valley claim. He reported at the office of the

district at ten o'clock in the morning if he had no business of his own, otherwise in the afternoon at two or three o'clock. This occurred three or four times a week. He examined twelve opinions, which required from fifteen minutes to an hour or two each. He testified that he thought his compensation was adequate. The commissioner recommended that he be censured. He filed no brief and argument in this court. It is probable that he is satisfied with the commissioner's recommendation. The report is affirmed.

Respondent Henry E. Jacobs was fifty-four years of age at the time of the hearing. He was admitted to the bar in 1901 and was employed by the sanitary district as assistant attorney from February 1, 1928, to November 15, 1928, at the rate of $4000 per year. He stated that he discussed the possibility of employment with Crowe, whom he told he had tried some cases against the district. He was assigned to work in the preparation of valley cases. Crowe told him fifteen or twenty cases would be assigned and gave him data to study. He reported to the district office twice during the month of February, 1928. No assignments were given him. In March and April he went to Crowe's office three or four times asking for work but was told not to worry. No work was assigned. After April 1 he reported weekly, though he did not ask for assignments. He was told to be ready. No assignment was ever given him. He testified that in order to be ready he read all the applicable cases, studied maps, contour lines, and put in three to five hours a day between March and November, largely in the evenings. During that time he was also employed in the offices of other attorneys. Andrew R. Sherriff, an attorney in Chicago, called by the relator, testified that he employed the respondent at $25 per week on respondent's statement that he was absolutely dependent on what he could make in that employment. He stated that respondent during that time did good work and put in full hours; that the witness did not know that re-

spondent was employed by the sanitary district but understood that $25 per week was all he had. It is clear from the evidence that he rendered no substantial service to the district. His argument is that he took $25 per week in the office of attorney Sherriff in order to have more time to devote to the district work. In view of the fact that he did not render any service and but few assignments were made to him it is clear that it must have become evident to him that he did not need additional time to transact legal business for the district. The commissioner recommends that he be suspended for two years. It must have been clear to him that he had no right to receive this money. His conduct in so doing is subject to discipline.

Respondent Kleofas Jurgelonis was forty-five years of age at the time of the hearing. He was admitted to the bar in 1920 but is not now engaged in the practice of law. He was employed by the sanitary district from December 2, 1927, to November 15, 1928, at $3600 per year. He states that he was assigned to lake levels litigation but notwithstanding such assignment did no work for six months, when he was assigned to work under the publicity department and directed to write articles for the district. He says that he addressed a number of meetings but did no other work. He rendered no legal services whatever yet for the period of employment received compensation regularly at the rate of $300 per month. It must have been apparent to him after the first month that he was rendering no services. The commissioner recommends that he be disbarred. He was evidently a truthful witness, and, so far as the record appears, a man of good moral character. It was clearly his duty to withdraw from the employment when it became apparent to him his services were not needed. We are of the opinion that while the record does not justify disbarment, his conduct requires discipline.

Respondent Meyer D. Kaufman was forty-three years of age at the time of the hearing. He was admitted to

the bar in 1915 and was employed by the sanitary district from March 1, 1927, to December 31, 1928, at $5000 per year. He was to put in full time and was employed on the regular pay-roll. He presented a letter to Brodie, who told him to come back the next morning. During the time of his employment he had no office of his own. He states that he put in all of his time for the sanitary district, performed whatever was given him to do at the office, such as going into court, taking data on cases, making investigations and going over certificates of title and releases. Though he did not try any cases he was assigned to certain cases which did not come up for trial during the time of his employment. He worked principally on certificates of title, complaints and releases on valley claims and on river straightening. He testified that he usually got to work at 9:30 to 10:00 o'clock in the morning and quit between 3:00 and 4:00 in the afternoon daily. The evidence of the witness Whitty was that he had been given two cases on which to be prepared for trial on which he made report, had general office work and was in charge of some small damage cases in the municipal court. It is evident that respondent, with fifteen years of experience at the bar, must have known that his salary was large for the character of services rendered, which were largely those of a law clerk, but it is also clear that he put in substantial time, took charge of whatever cases were placed under his control and was ready to dispose of them if they came up. While the salary received by him was much in excess of the value of services rendered, it does not appear that his failure to resign because of the disparagement between the character of service and the compensation amounted to a fraud on the district. The commissioner recommends that this respondent be censured. We are of the opinion, however, that the record does not justify discipline.

As to respondent John B. King the commissioner recommends that the rule be discharged. Exceptions and briefs

have been filed by the relator. Counsel for relator argue that the record fairly shows that this respondent did not render valuable service for the years 1927 and 1928 but that the services as to which he offered proof were rendered in the year 1929 under a different administration, and that his statement that during the years 1927 and 1928 he was preparing for the work done in 1929 is not a valid explanation but is an attempt to mislead the commissioner and the court. This respondent was employed from March, 1927, to July, 1929, at a salary of $6000 per year. The information relates to the adequacy of his services during the years 1927 and 1928. As we have said, the commissioner found that the proof did not establish that he had not rendered adequate services during 1927 and 1928. On examination of the briefs and abstract pertaining to this respondent we are of the opinion that while explanations in his testimony as to how his services were rendered are by no means full, his testimony is not contradicted by the testimony of any other witness appearing in the case, and we are of the opinion that the commissioner was justified in taking the view that the relator had not made out a case against this respondent with the clarity which the rule requires, and the commissioner's report will be affirmed as to this respondent.

Respondent Joseph A. Kolb was thirty-nine years of age at the time of the hearing. He was admitted to the bar in 1920 and was employed by the sanitary district from June 1, 1927, to October 7, 1927, but did not draw the semi-monthly pay checks and was not on the pay-roll. He was paid by a voucher. He thus received the sum of $2000. The voucher was handed to him by the auditor of the district in the presence of alderman Dorsey R. Crowe, respondent's partner. Respondent then endorsed the voucher and turned it over to Crowe. Respondent was employed on the recommendation of political friends. He was assigned to the water survey department and told to

see Thomas Garry. He testified that he went to 1140 South Michigan avenue and found Garry on the second floor of a three-story building, where he saw many desks and people, all of whom seemed busy. He further testified: He was at Garry's office about twenty minutes. The next day Garry came to his office with some forms for respondent to look over. These forms were to be used by investigators in the matter of the use of meters by consumers of water. Garry thereafter came to respondent's office four or five afternoons a week and would sometimes remain until seven or eight o'clock. Respondent did no other work except to make himself familiar with the meter controversy which then existed between the city and the district. Numerous witnesses who were regular officers in the legal department were called and could give no information as to respondent's work. Respondent testified he thought the sum of $2000 was not sufficient compensation for the work he did. The commissioner recommends that he be suspended for the period of one year. His duties were largely those of an investigator in the meter controversy and he did but little in that connection. It is evident from respondent's own testimony that he did not render adequate services for the compensation. The only service he testified to relates to conferences with Garry on the afternoons of four or five days a week. He evidently made no report to anyone at the district office concerning the matter. It is difficult to gauge the value of this service, and the record does not disclose that he was placed on regular employment but the sum of $2000 was paid him as a lump sum for the services rendered. It is clear, however, that respondent's attempted explanation of the services rendered is by no means satisfying. We are of the opinion that in accepting the voucher for $2000 he had not rendered therefor any service of substantial value. Such conduct violated his duty as a lawyer and is subject to discipline.

Respondent Medard A. Kunz was forty-two years of age at the time of the hearing. He was admitted to the bar in 1915 and was employed as assistant attorney for the sanitary district from August 31, 1927, to December 31, 1928, at $6000 per year. He was employed by president Crowe. He states that he reported at 9:30 to 10:00 o'clock, daily, looked up files in lake levels cases and held himself in readiness. He states that he made no reports of his work, that he occasionally looked at the sanitary district laws, attended weekly board meetings, special meetings and committee meetings, and was in direct contact with one of the trustees and reported to him orally. It is evident that he rendered no services of substantial value though his employment lasted for a period of more than twelve months. It is evident that he must have known after the first month of employment that there was no particular work for him to do yet he drew the salary of $500 per month. His conduct is subject to discipline.

Respondent Nathan A. Lawrence was forty-two years of age at the time of the hearing. He was admitted to the bar in 1915 and was employed by the sanitary district as an assistant attorney on February 1, 1927, at a salary of $4000 per year. Six weeks thereafter his pay was increased to $5000 per year. This he drew until April 30, 1927, when he was dropped from the pay-roll. On June 1, 1927, he was reinstated and remained in the employment of the district until November 30, 1928. His appointment was procured through a ward committeeman. He testified that he arranged to work for the district in afternoons; that he examined titles set out in releases in valley claims, was at the district offices from 1:00 P. M. to 4:00 or 5:00 P. M. from one to four days per week, and was given two or three valley cases. The regularly employed attorneys of the district had no information about him, although the chief clerk remembered having seen him at the district office. He was employed twenty-one months, and

the only work he did was to prepare a few lists not explained and examine certain certificates of title. It is evident that his appointment was a matter of political preference and that he gave no substantial services for the salary paid him. The salary he received was unreasonably excessive, as he must have known. No bad faith in taking the position is to be imputed, but it must have been clear to him, not only as a lawyer but as a man of intelligence, that there was no basis for the amount of compensation he was receiving. His conduct merits discipline.

Philip A. Lozowick was twenty-seven years of age at the time of the hearing. He was admitted to the bar in 1925 and was employed as assistant attorney for the sanitary district on the regular pay-roll from May 1, 1927, to December 31, 1928, at $5000 per year. He testified that he was told he would do trial work in the valley cases and he prepared to try some of these cases. While waiting for this work he checked certain valley claims against suits pending, about fifty in number. He was then assigned to twenty-three valley cases pending in Pike county. He was told to prepare for trial because he was to try them. Other attorneys were to handle the pleadings. He studied the pleadings and made investigations of the law, checked some releases in valley claims, tried two or three cases of garnishment brought against employees' salaries and completed docket sheets of cases pending in Cook county. He states that he spent about sixteen hours a week at the district office. There is corroborating testimony that he was assigned to valley cases. The commissioner recommends his suspension for two years. This respondent was a young and inexperienced lawyer, and in view of the character of litigation arising out of the valley cases it is difficult to believe that he was sufficiently experienced to try them or that the management of them was assigned to him. The testimony is that certain valley cases were assigned to him. He, alone, testified that he was to try them. It appears from the

record that the work he did, amounting to about sixteen hours per week, was that of a law clerk. Even with his lack of experience it must have been apparent to him that he was not giving substantial *quid pro quo* for the salary received, yet he continued to take the checks as long as they were issued to him. His conduct merits discipline.

Respondent Edward Philip Luczak was thirty-one years of age at the time of the hearing. He was admitted to the bar in 1923 and was employed by the sanitary district from February 26, 1928, to June 25, 1928, and from September 1, 1928, to November 30, 1928, a total of about seven months, at $3600 per year. He was re-employed by the district in 1930 and is still so employed. His employment was secured through political channels. A desk was assigned to him at the district office. He stated that he was told that no work would be assigned to him at once but he was to familiarize himself with the work of the district, which he did, spending three to five hours each day reading the sanitary district laws. During his employment he was assigned to fifteen or twenty cases to check up the pleadings. They were largely valley cases. He stated that he checked up the pleadings to see that they were in proper condition, meaning that he saw to it that the district was not in default in the method of pleading. He was assigned several cases to brief. He testified that he did some work for the district at home during the evenings. It is evident that he did some work for the district and was there to do what was required of him, though the work he did was evidently more in the nature of a law clerk's duties. In consideration of these facts we are of the opinion that the charges of misconduct against him are not shown with that clarity necessary to justify discipline.

Respondent Carl H. Lundquist was forty-eight years of age at the time of the hearing. He was admitted to the bar in 1922 and was employed by the sanitary district from October 1, 1927, to November 30, 1928, at the rate

of $5000 per year. He had had experience in the office of the corporation counsel of the city of Chicago and from there went to the sanitary district. He received his appointment from president Crowe, nothing being said as to how much time he'was to put in. He called at the office and talked to Brodie. He reported daily for one or two weeks and was then given five valley cases pending in Cook county. He states that he later reported that he had the cases well in mind and able to handle them. He spent about a month preparing demurrers to be filed in those cases, but the demurrers were never argued. After that he read the law whenever he had an opportunity to do so. This he states was all the legal work he did. He attended a school of instruction on publicity work and made about a dozen addresses, non-political in character. The testimony of other witnesses shows that he did not engage in any trials. Those directly in charge of the office work knew little about the character of work done by him. The testimony offered in his behalf indicates that he is a lawyer of considerable ability and industry and is trustworthy. Numerous technical questions of pleading and others of a technical nature are raised in his brief. Under the view which this court takes of proceedings of this character, as indicated in this opinion, such questions are not important. Other questions raised in his brief have been considered in the earlier parts of this opinion. There is no doubt as to the good faith in which this respondent entered into the service. It is equally clear that it must have been apparent to an attorney of his information and experience, many months before his connection with the district was severed, that he was taking public funds without rendering anything like adequate service therefor. His conduct therefore merits discipline.

Respondent Sidney Lyon was forty-five years of age at the time of the hearing. He was admitted to the bar in 1908. He was elected to the General Assembly in 1917

and served there for twelve years. He was employed by the sanitary district from July 1, 1925, to January 15, 1927, at the rate of $2400 per year. He was again employed in that capacity from August 1, 1927, to January 11, 1928, at the rate of $5000 per year, and later, from February 17, 1928, to November 30, 1928, at $5000 per year, the total received by him from the sanitary district being $9451.10. He testified that he requested that he be taken off the pay-roll when the legislature was in session, and that he did not think he was ever on the pay-roll during such sessions. He was dropped from the pay-roll January 1, 1927, and re-employed in August of that year. He stated that when the special session of the legislature convened he supposed he was off the pay-roll, as he did not desire to be employed by the district during that time. He testified that certain signatures on the pay-roll were not his but those of his clerk. He did special legal work for the city during a portion of the time he was employed by the district. He testified that when re-employed after the 1927 session of the legislature he told the trustees of the district that he wanted to get trial work; that president Crowe employed him at $5000 per year, beginning August 1 of that year, and that it was understood that when the legislature was not in session he was to return to the service of the district. He testified that certain work at correcting briefs on the liability of the district in overflow cases, occupying three or four months, was done by him; that twenty-four cases were assigned to him in Scott county, and that he made some trips down the valley. He tried no cases for the district and argued no motions or demurrers. He stated that he did various kinds of work for the district, enumerating a number of them, and including assistance by him in the preparation of bills to be presented to the legislature affecting the interests of the district. The testimony of other lawyers of the district does not tend to corroborate his statements as to extensive work during the time that he

was employed. From February 17, 1928, to November 30 of that year, when he was dismissed, the record fails to disclose any work done by him. During the early portion of this period he was also employed by the city in the trial of condemnation cases at a salary fixed on the basis of $5000 per year. Counsel argue that this respondent was to render services only when called upon. It must, however, have been evident to him when he discovered that he was not being called upon, that he had no right to take public funds. An examination of the record discloses that, allowing to him in the fullest measure the amount of time he devoted to the services of the district in the twenty-five and one-half months for which he was paid, he put in a total of less than nine months' work. During a portion of this time he was in the legislature and voting on matters of vital interest to the district and receiving pay from it. The commissioner recommends that he be censured. We are of the opinion the record calls for a more substantial discipline.

Respondent Stephen A. Malato was fifty-eight years of age at the time of the hearing. He was admitted to the bar in 1907. He had had experience as assistant State's attorney and was employed by the sanitary district from February 1, 1928, to December 31, 1928, at $7500 per year. His appointment was procured through political channels. He was employed in a "budget position." He stated that Hoyne told him he was not to prepare the cases but to try them, though he was to prepare himself on the law relating to district matters and report to the attorney for the district three or four times a week. He did not try any cases as they were not brought to trial. He stated that he was ready to try them. He delivered some addresses in the educational work of the district, and this was all the work he did. Respondent Hoyne, who was attorney for the district at the time of this respondent's employment, denied that he had any conversation with him with

reference to his being employed for trial work. Respondent stated before the grievance committee that if there was no work for him he did not earn the money; that he had no independent information as to what was to be done except from Crowe and Hoyne; that he supposed he was to work and was to hold himself in readiness for the trial of cases when they were called for trial. Relator argues that respondent should have found out whether these cases were to be tried, and if they were not, then to sever his connection with the district. In this situation his employment differed from that of other respondents. It was but prudent that the district have a reasonable number of trial lawyers prepared to try its cases before the jury should they be tried. The fact that but two cases were tried in the three years ending December, 1928, indicates no need for such a number as were put upon the pay-roll. Whether this respondent would be called upon to try cases depended also upon whether the cases under the management of other lawyers of the district would be set for trial. The record shows an agreement during the pendency of the Coal Creek and Christie cases that no other cases would be tried. It is evident that he gave little service for the salary received, though had he engaged in the trial of cases, as he was employed to do, the salary would have been but reasonable. He stated that he did not want to take money that he did not earn. The record indicates that he has had large experience as a trial lawyer, but we cannot escape the conviction that his experience and his duty to his profession required that he make an effort to determine whether his services were to be needed, and when he found they were not, to withdraw from the employment. The commissioner recommends disbarment. We do not feel, on the evidence, disbarment would be justified, but it is clear that his failure to determine the true condition of the law work of the district and withdraw from service merits discipline.

Respondent Arthur F. Manning was thirty-nine years of age at the time of the hearing. He was admitted to the bar in 1916 and was employed by the district from August 16, 1927, to November 30, 1928, at $5000 per year. His appointment was political. President Crowe told him the sanitary district needed lawyers, later sent for him, and he was employed. He stated that he was told there were many suits against the district in the Illinois valley, in two of which there had been large verdicts; that these cases had been appealed, and that when they were disposed of many others would be taken up and tried. Respondent testified that he was at the district office practically every day and examined questions involved in the valley cases and in the lake levels case. He stated that one case was assigned to him which he watched. In this case a demurrer to the declaration was sustained and a rule entered to file an amended declaration. Finding no data in the files about the case he took a non-suit and prepared an amended declaration. He attended the school for educational propaganda of the district and addressed a number of meetings. The evidence clearly shows that he received a salary far in excess of the value of services rendered. The record also indicates that he was truthful and frank, though he testified that he thought the salary paid him was reasonable. His misconduct lay in not properly weighing that which is so clearly evident in this record—that is, the gross inadequacy of the services rendered for the amount of public funds received in payment therefor. The record in his case does not justify disbarment but does require censure.

Respondent Harry Mantell was thirty years of age at the time of the hearing. He was admitted to the bar in June, 1927, and was employed by the sanitary district from September 17, 1927, to June 25, 1928, and from July 16, 1928, to November 30, 1928, at $6000 per year. He stated that he was to receive assignments and was told by Brodie to familiarize himself with the work of the district. Be-

tween June 25 and July 16, 1928, he was off the pay-roll at his own request because he was out of the city. He merely reported two or three times a day for the first three or four months. After that he reported once or twice a week. He was told he was to be assigned to valley cases, but no work was given him and he never did any actual work for the district though he received the sum of $6408.46. Even making allowances for the lack of experience and understanding of this young lawyer, who was put upon this pay-roll three months after his admission to the bar at a salary of $6000 a year, it must have become evident to him within a month or two not only that he would do no work but that he was not expected to do any work. He filed no answer to this information but filed a questionnaire with the grievance committee of relator, appeared when notified and appeared before the commissioner and testified. He does not explain his failure to answer the information. An information in a case such as this is a direct call upon an attorney by the court that he speak. The choice of silence is not open to him if he is to remain an officer of the court. (*People* v. *Culkin,* 248 N. Y. 465.) The commissioner has recommended the disbarment of this respondent. We are of the opinion, however, that by reason of his comparative youth and his lack of experience the record does not justify his disbarment. That it merits discipline is clear.

Respondent George H. Mason was fifty-seven years of age at the time of the hearing. He was admitted to the bar in 1896 and was employed by the sanitary district as assistant attorney from August 1, 1927, to November 30, 1928, at $7500 a year. His appointment was secured through political channels. Crowe told him there were many overflow damage cases against the district in which they needed his help and that they might want his help in the lake levels controversy. He testified that after his employment he put in about thirty days' time during the next three or four

months familiarizing himself with the law and the proofs in the valley cases and looking into the lake levels case. No valley case was assigned to him though other cases of small importance were given him. He testified that after the first three or four months he looked up matters pertaining to the district when he had time, because he was naturally interested. He testified that because of his employment with the district he was required to retire as an active solicitor in important litigation and remain in a consulting capacity only and feels that the compensation he received was for this reason not excessive. Numerous questions are raised in the briefs of this respondent which have heretofore been considered in this opinion. The commissioner recommends that respondent be disbarred. It is evident the compensation paid him was excessive when considered by any reasonable standard. Long before his employment actually terminated it must have occurred to him that it was his duty to withdraw from further participation in the public funds. He was paid $10,000 for what were really meager services. He was a lawyer of more than thirty years' experience and his duty to the profession must have impressed itself upon him more than once. He was not employed on full time but with the understanding that the district should have first call upon his time. Though he says that he gave up valuable law business, which, if true, tends to indicate that he expected to render value for the salary paid, it is clearly evident from this record that he soon knew that he was not needed. His employment with the district evidently did not encroach upon his other law business, for he rendered no appreciable service. His conduct requires discipline.

Respondent James J. McDermott was thirty-six years of age at the time of the hearing. He was admitted to the bar in 1920 and was employed by the sanitary district as assistant attorney from August 4, 1925, to April 30, 1927, at $2400 a year, and thereafter from February 20, 1928,

to November 30, 1928, at $3600 per year. His appointment was made through political channels. He stated that he was engaged to do trial work at $200 per month on a part-time basis, and on his second employment was told that a number of valley cases were coming up and he could come back and do that work if he desired. He reported but the chief clerk did not notify him of any assignments. On September 1, 1928, he was given the transcripts in three cases heard before the claims commission. He prepared some opinions in those cases. In 1925 and 1926 he examined a number of declarations and prepared briefs on the organic law of the district, prepared briefs on the question of mosquito abatement, spending five or six weeks on it, and on the police power of the district and other like matters. He did not know how many hours he put in for the district, because he was employed to come when required. There is other evidence in the record tending to indicate that he had been given valley cases. He stated that he could not say whether his compensation was fair and reasonable. He did not work continuously and does not claim that he did. The record indicates that about fifty per cent of his time was employed in district work. It is evident that in that time he rendered such services as were required of him, and while the compensation paid him was disproportionate to the service rendered and it may well be doubted whether he should have continued under an arrangement of that kind, the facts shown by the record are that he was employed only for part time and that he rendered substantial service of the character required of him. We are of the opinion, therefore, that the record does not justify discipline of this respondent.

Respondent Eugene L. McGarry was admitted to the bar in 1915. He was employed by the district as assistant attorney between February 1, 1928, and November 30, 1928, at a salary of $4800 per year. It appears that under his contract he was to prepare himself in the lake level contro-

versy and was to receive $100 per day during the trial of lake levels cases. An issue raised in his case concerns the character of his contract—that is, whether it constituted general employment or one for specific services. It appears from the record that he was not engaged for a specific time but rather to prepare himself in the lake levels case; that he made trips to Detroit, Milwaukee and Washington, and at other times examined leases and did some other work. If the testimony of the respondent is to be believed—and it appears not to have been refuted—there was a special contract for services in that case, and the record, so far as this respondent is concerned, does not fully disclose the nature and value of his services and therefore does not sustain the charge filed against him. The commissioner so found, and we are of the opinion that his finding should be affirmed.

Respondent Mark J. McNamara was fifty-eight years of age at the time of the hearing. He was admitted to the bar in 1894 and had had experience as assistant prosecuting attorney. He was employed by the sanitary district as an assistant attorney from November 1, 1927, to November 30, 1928, at $5000 per year. He states that he met various lawyers of the district, who told him there was plenty of work to do. Around Thanksgiving day of 1927 he talked to one of the commissioners about drafting an ordinance. He had a further conversation in January, 1928, about this ordinance. The ordinance was later drawn and passed, but he did not draw it. He put in a day and a half in consideration of the matter. He went to the district office two or three days a week, usually getting there about 10:00 o'clock in the morning and leaving at 11:00 or 11:30. He attended practically all the board meetings though he performed no duties there. He did no other work for the district. Other testimony tends to indicate that cases were assigned to him; that he was seen about the office, but lawyers in the regular employ of the district did not know

what, if any, work he did. It is evident that he did not render any appreciable services to the district for the compensation received. From the latter part of January, 1928, until the end of November, 1928, he did practically no work except attend meetings of the board. His mature years and experience must have warned him that he had no right to receive public funds under such circumstances. His conduct merits discipline.

Respondent Abraham L. Missner was thirty-four years of age at the time of the hearing. He was admitted to the bar in 1923 and employed by the sanitary district as assistant attorney from June 16, 1928, to November 30, 1928, at $5000 per year. His employment was through political channels. He stated that the chief clerk gave him a couple dozen files on valley cases with instructions to examine the pleadings and see if they were properly filed, which he did; that he was to prepare himself for valley cases, and that he examined the abstracts in twenty cases, read the decided cases on the subject and wrote opinions, at which work he spent two or three hours per day for a period of about a month. It is clear from the record that this young lawyer did not render services commensurate with the salary received and that it should have been apparent to him before his employment terminated that the duty rested upon him to terminate it of his own volition. While his conduct does not justify disbarment or suspension he should be censured.

Respondent G. Edwin Mitchell was thirty-seven years of age at the time of the hearing. He was admitted to the bar in 1922 and employed by the sanitary district as an assistant attorney from September, 1924, to June 25, 1928, continuously, at $6000 per year. His appointment was through political channels, and apparently his retention throughout that period was in a measure due to influences arising from the same source. He spent several months in the abstracting of lake levels testimony and prepared copy for the printer. He studied law propositions presented to

him by attorneys for the district, worked on various cases filed, watched calendars, revised annotated laws relating to the district, attended hearings and examined testimony taken before the claims commission in eight or ten claims. During the summer of 1925 and 1926 he performed the duties of other attorneys while they were away on vacations. In 1927 and 1928 he was assigned to help the docket clerk. He stated that he had daily conferences in that work with other lawyers; that he put in, during the three years, three days out of five in court or the district offices and in doing investigating for the district. There is little in the record to substantiate his testimony as to what work he did, as most of the witnesses called upon did not have information as to that matter. The record contains much in detail which is difficult to summarize. His testimony that he worked at the office daily has some corrobation. He was a regular appointee whose service began prior to the date of excessive loading of the pay-roll with useless attorneys. While we are of the opinion that the work rendered by him was more in the nature of a law clerk, with some handling of cases, and the compensation received was excessive, we are also of the opinion that the record does not with required clarity show a breach of his duties as a lawyer requiring discipline.

Respondent William S. Newburger was sixty years of age at the time of the hearing. He was admitted to the bar in 1893 and was employed by the sanitary district as an assistant attorney from March 1, 1928, to November 30, 1928, at $6000 per year. His appointment was through political channels. Nothing was said about the time he was to put in. He was assigned some bankruptcy cases in which the district was interested. Numerous witnesses who were regular lawyers of the district had no information as to the services he rendered. He did no work. During the time that he was employed by the district he received $4500. Of his own volition he re-paid that sum to the district in

August, 1930, though no demand had been made for its re-payment. The evidence is clear that he rendered no valuable service to the district and that the $4500 was not earned. His return of the money indicates that he had arrived at the conclusion that he was not entitled to it and should not have remained in that service. The return of the money received by him, while by no means excusing the taking, indicates that he appreciates the duty of an attorney in connection with receiving public funds grossly in excess of the value of·services rendered. Such re-payment, however, is not to be taken as complete absolution, since his receipt of the money was voluntary. Such conduct deserves discipline.

Respondent Victor I. Ohrenstein was sixty-two years of age at the time of the hearing. He was admitted to the bar in 1890 and employed by the sanitary district as an assistant attorney from February 15, 1927, to April 15, 1927, and thereafter from September 16, 1928, to November 30, 1928, at $5000 per year. He made an application to president Crowe for work with the district. He testified that he told Crowe, the president, that he could not put in full time but wanted sufficient work to justify the salary which would be paid him; that he made the same suggestion to Hoyne, who referred him to the chief clerk for assignments; that he was promised assignments, and four or five days later repeated the request and was told to see one George B. O'Reilly for the purpose of assisting in valley cases; that O'Reilly told him the law had been briefed, the facts marshaled, and that respondent would be notified when he would be wanted to help in the trial. These were the only attempts to render service during the first period of his employment. He was discharged and later his reinstatement was arranged. He testified that he thereafter discussed with Crowe a case involving $200,000 and that he was assigned to investigate that case, and aside from an extended period of illness from appendicitis put in the

rest of his time on that. No explanation is given of the character of this case or his work upon it. Whitty testified that Cook county valley cases were assigned to him. Other witnesses from that office had no information concerning his work. It is evident from the record that he did little work of value for the district though he received compensation amounting to $1874 during the period of his employment. The record does not show that the district received any benefit whatever from his connection with the case referred to by him. He was not frank in his testimony. It must have been apparent to him before the period of his employment expired that he was taking public funds without rendering services therefor. His conduct merits discipline.

Respondent Adam E. Patterson was fifty-one years of age at the time of the hearing. He was admitted to the bar in 1902. He states that he had had experience as assistant corporation counsel and was employed by the sanitary district as an assistant attorney from November 16, 1927, to November 15, 1928, at $3500 a year. His appointment was secured through political channels. When reporting for service he was told there was nothing for him to do but to hold himself in readiness and service might be assigned. He stated that he reported daily for five or six weeks and thereafter two to four times per week; that he insisted that work be given him, and that he began to think there was discrimination against him. He testified that work was promised him but no employment was given. He was evidently a lawyer of some experience but gave no service to the district whatever. Nevertheless he drew a salary at the rate of $300 per month, and it is not sufficient that he, as a lawyer, stood ready and willing to render service. He knew that he was rendering no service but was taking the public funds. The fact that he had a contract with the district trustees was not sufficient, as we have indicated, to relieve him from discipline. The commis-

sioner recommends that he be disbarred. We are not, however, disposed to disbar him on this record. His failure to withdraw from the employment when he found no opportunity would be given him to render service indicates an inadequate appreciation of and failure in his duties as a lawyer and merits discipline.

Respondent Joseph E. Paulissen was served with copy of the rule to answer but filed no answer. During the time of the hearing his whereabouts was unknown to the commissioner. Witness Henry A. Blouin testified that respondent was in California and intended to stay there and that he was not practicing law. The record contains no evidence as to his personal history. It shows that he was employed by the sanitary district from August 1, 1927, to November 15, 1928, at $3600 per year. No evidence appears in the record as to what, if any, services were required of him or rendered. No objections have been filed to the report of the commissioner recommending that he be disbarred. The commissioner, however, states a communication was received by him from respondent after the first publication of his report, stating that respondent had no funds with which to employ counsel and was no longer in the practice. Respondent intimates in his letter to the commissioner that his defense is not a strong one. There is in the record, however, little, if any, evidence as to the character of his employment. What there is of it indicates that he took the public funds without giving return therefor. The fact that he made no appearance and paid no attention to these proceedings strongly indicates that he does not view the responsibilities of a lawyer as vested with any degree of seriousness. His conduct requires discipline.

Respondent Leo V. Roeder was sixty years of age at the time of the hearing. He was admitted to the bar in 1892 and was assistant Attorney General in 1916. He served in the law department of the board of education of the city of Chicago from 1923 to 1927 and was employed

by the sanitary district of Chicago from March 16, 1928, to November 30, 1928, at $6000 per year. His appointment was secured through political channels. He stated that he thought this salary was not sufficient, but that it was finally agreed that he would not have regular hours and would receive $9000 a year for the following year. He testified that Brodie, the chief clerk, asked him, when he reported, who his sponsor was and promised to assign some cases to him, and that various cases were assigned, six of which were in the superior court of Cook county and five in counties in the Illinois valley. He testified that he also checked some leases, and that he worked twelve to fifteen hours a week for the district. This respondent also attended board meetings and made some trips into the Illinois valley. His testimony is corroborated to some extent by other officials in the district offices. He tried no cases and argued no demurrers. He prepared to try them and watched them on the calendar. The cases, however, were not called for trial. He was told by his superiors that lawyers in charge of the valley cases did not want the cases assigned to him to be "stirred up," evidently meaning that trial would not be urged on the part of the district. This respondent was an experienced lawyer. He must have realized before his employment by the district had proceeded for any considerable length of time that he was receiving money for work he was not doing. From this record respondent's conduct subjects him to discipline.

Respondent Ivor L. Smith was thirty-five years of age at the time of the hearing. He was admitted to practice on a license of the State of Virginia in 1927 and was employed by the sanitary district as an assistant attorney from June 12, 1926, to April 30, 1927, and from September 23, 1927, to November 15, 1928, at $3000 per year. His appointment was secured through political channels. He was assigned to cases involving the garnishment of employees' wages. He had from one to fifteen of the garnishment

cases per week, which were usually handled without court proceedings. In his second employment he was employed on part time on the lake levels controversy. He stated that he started to study that case but found it too extensive for him to cover and that he was not called upon to do anything in connection with the case. He reported at the office daily. He testified that he frequently asked Whitty for work on valley claims but was unable to find out what he was supposed to do. He testified that of his first period of employment he spent one-third to one-half of his time for the district; that he did not spend a great deal of time working but most of it trying to get work. There is in the record the testimony of other witnesses who saw him about the office but no one seemed to know what, if any, work he did. The commissioner recommends that this respondent be censured. Respondent has filed no exceptions or brief and argument, and it is evident that he is satisfied with the recommendation of the commissioner, and the same will be approved.

Respondent William Scott Stewart was admitted to the bar in 1911 and was employed by the sanitary district from December 1, 1927, to November 30, 1928, at $6000 per year. He testified that he did not apply for the position; that he rendered substantial service in the settlement of labor difficulties; that he put in on an average more than three hours per day in his work for the district and that he was employed on part time. He filed twenty-nine affidavits in corroboration of his testimony. The commissioner finds that respondent's employment was for special work, the value of which is not clearly shown by the evidence, and in his report recommends that the rule be discharged as to respondent. Relator excepts to this recommendation and recommends his suspension for a period of one year on the ground that the evidence shows that respondent was on the pay-roll and was not employed to do special work and that he did not render adequate services. Respondent's

testimony as to the special character of his duties is not disputed and possibly could not be. His testimony concerning the settlement of labor difficulties and other work is in some measure corroborated by the affidavits filed. We cannot say that the commissioner's recommendation is not justified on the ground of lack of proof of facts sustaining the charge, and it will be approved.

Respondent Augustus L. Williams was fifty-four years of age at the time of the hearing. He was admitted to the bar in 1910 and was employed by the sanitary district as an assistant attorney from August 16, 1927, to November 30, 1928, at $4000 per year. His employment occurred through political channels. He was assigned to valley claims. He was to report to the office daily. He testified he performed legal services for the district; that he was assigned to four or six lawsuits and looked to them first; that he was at the office daily from one hour to a half day, made oral reports, studied pleadings and was familiar with the Coal Creek case. He thought his compensation was reasonable. The commissioner was of the opinion that he did not do his duty to his client and recommends that he be censured. The contentions of this respondent in his brief are of the character hereinbefore discussed. It is apparent from the record that this respondent did not render services commensurate with the compensation received, and that though he desired to work he should have resigned when he discovered that he was not to have an opportunity to render adequate service. The recommendation of the commissioner is approved.

There remains of the charge against those respondents other than Hoyne, the information affecting Edward H. Luebeck. He was forty years of age at the time of the hearing. He was admitted to the bar in 1911 and was employed as assistant attorney by the sanitary district between March 28, 1927, and November 30, 1928, at $6000 per year. His appointment was procured through political

channels. He testified that his work for the district required his presence out of Chicago for one-half the time he put in for the district; that he made one trip lasting eight days, made four trips to Washington and twenty or thirty other trips of perhaps two days each. He stated that he put in one-half his time on district matters, and that the trips he took had to do with the lake levels controversy. This respondent claimed that his work for the district was of a privileged character. He stated that he was working under the direction of president Crowe, though not for him personally, and that he did not render expense accounts because Crowe did not want it known where he had been. Respondent testified that he also made numerous trips to Springfield and that he wrote one or two opinions requiring two or three days' of his time. He stated that he did the work which he was hired to do. There is evidence of other witnesses tending to show his presence at the district office, but no one knew the character of his work. He stated that he took employment with the understanding that he was to pay his own expenses on the trips he made, which for the period of his employment amounted to between $3000 and $4000. During the pendency of this cause before the commissioner the relator filed in this court a motion for an order directing that the commissioner take the testimony of this respondent and report the same to the court without publication. An order to that effect was entered in this court and was later vacated on the ground that the testimony sought of respondent appeared from the record to be privileged, and respondent's client not having waived the privilege, respondent could not be required to testify. Renewal of the motion to require respondent to testify is filed in this court. On further examination of this record we see no reason for changing the final order made by this court in the matter. No good reason appears why a municipal corporation as well as a private individual may not have privileged communications with its attorney.

Counsel for the relator argue that, even without full infor-
mation as to what respondent did, it was apparent from
the evidence that the services rendered were inadequate.
He testifies, however, that out of the sum received he paid
the expense of the various trips he took, and while we agree
with the suggestion of relator that he should have made a
more specific showing within the limits of his privilege so
to do, the fact remains that the charges made against him
have not been substantiated. There being no showing of
further evidence to be produced, this court is unable to say
whether this respondent received excessive compensation or
did not. As to him the rule must therefore be discharged.

These are the respondents other than Maclay Hoyne,
as to whom the situation is different. It has been neces-
sary to, in a measure, classify the objections and arguments
of these respondents, but the case of each one has had in-
dependent consideration.

The charges against Maclay Hoyne are of an entirely
different character. He was elected as attorney for the
district by the board of trustees in December, 1926, under
powers conferred by statute, continued in that capacity un-
til January 17, 1929, and remained throughout that year
as special attorney. The charges against him are that he
knowingly acquiesced in the acts of the trustees placing
an excessive number of lawyers on the pay-rolls of the law
department of the district and in the payment to them of
salaries grossly in excess of the value of services rendered,
and that he approved and signed, thereby giving effect to,
the semi-monthly pay-rolls of the law department knowing
that they bore the names of many lawyers who performed
little or no services for the money received by them, where-
by he knowingly permitted a fraud to be perpetrated upon
the public through such use of the funds of the district.
This respondent answered the information, setting out cer-
tain rules enacted by the board of trustees and averring
that he in good faith believed, and still believes, that it

was his duty, under those rules, to place upon the pay-rolls of the district such employees of the law department as the committee on employment of the board of trustees appointed and at the salary fixed by that committee, and that it was his duty to certify a list or statement of each employee so appointed by the committee on employment, with the salary of each, for the semi-monthly period for which the list was made, until he was notified of the discharge of the employee by that committee. He also avers that the rules of the board required him to mark "Approved" on the pay-rolls prepared by the clerk, and that in so doing he was performing a duty placed upon him by the rules of the board, which he in good faith then believed, and still believes, it was his legal duty to perform, and that he could have been compelled by *mandamus* so to do. He further avers that he did not appoint, suggest, recommend or concur in the appointment of any of the respondents, and that he did not fix, suggest, recommend or concur in the amount of compensation fixed for each or any of the respondents. This respondent is a lawyer of experience, having served as corporation counsel of the city of Chicago and as State's attorney of Cook county. He states that he was not a candidate for the position of attorney for the sanitary district.

Under the ordinances of the district certain standing committees were created, of which all of the nine trustees of the board were members. Among those were a committee on finance and one on employment. The rules of the board provided that the committee on employment appoint all employees of the district and that the chairman of that committee shall certify in writing to the head of the proper department, and to the clerk, the names of such employees, stating the position to be filled and the compensation to be paid to such employee. By the rules of the board it was made the duty of the department head and the clerk of the district to include the name of each employee upon the pay-roll of the district. The committee on employment alone

was empowered to discharge any employee, and could do so at any time when in its judgment such was deemed advisable for the good of the district. The head of any department of the district had power to suspend any employee in his department for cause and was required to report his action to the committee on employment. The committee on finance was required, under the rules, to examine all bills, vouchers and requisitions before they were acted upon by the board. On or before the first day of December each year the head of each department was by the rules required to submit to the finance committee an estimate of the amount of money required for that department for the coming fiscal year. Under the ordinances of the board the heads of the departments and other officers were elected by the board to hold their offices during the pleasure of the board. The heads of departments were given charge of their respective departments under the direction of the board. Among the officers of the district to be elected by the board was the attorney. Each officer so elected was required to subscribe an oath and furnish a bond, with surety to be approved by the board. This respondent furnished a bond in the sum of $20,000. It was the duty of the clerk to prepare the pay-rolls as provided by the rules and perform such duties as were required by law and by the board of trustees, including the keeping of the records of the proceedings of the board and the printing of the same when directed.

The rules provided that the attorney for the district have charge of all litigation of the district, devote his entire time thereto, attend or be represented at all meetings of the board or its committees, and give written opinions on all questions referred to him by the board, its officers and committees in discharge of their duties. The rules also provided that the head of each department make up and audit a list of all employees of his department, with the statements of amount due each employee for salary or wages, at the

close of each half month. This list was to be approved and certified by the head of the department and transmitted to the clerk, who thereupon made up a pay-roll embracing all officers and employees. This pay-roll was then approved by the committee on finance before the checks or vouchers were issued in payment.

Rule 12 of the board required that "each head of a department shall, in addition to all other requirements, bring to the attention of the appropriate committee all matters connected with his department." Nowhere in this proceeding is it contended by any of the respondents that the appointment of this large number of lawyers and the payment of their salaries were justified by the conditions existing in the legal department of the district, but, on the other hand, the entire case has proceeded on the concession of all that extravagance and a waste of public funds was indulged. The charge against this respondent is that his acquiescence in that extravagance and waste made the same possible; that a duty rested upon him to prevent or remedy that condition as far as he could, and that in his acquiescence in such condition of affairs he is chargeable with dereliction of his duty as an attorney. No question is raised by the relator as to the powers of the sanitary district to regulate the duties of its officers. It is conceded that the attorney for the district is a statutory officer, who has only such powers and duties as are prescribed by statute or by valid ordinances of the municipality. Relator also concedes that a lawyer who is an officer having no power to authorize or disapprove an expenditure and no power to pass upon its propriety but who possesses purely ministerial power to certify for payment a voucher or warrant issued by the municipality, without the exercise of judgment or discretion as to such approval, cannot be held accountable for approving such expenditure either on the ground that it was illegal or unnecessary, or the amount was unreasonable, or that no services were rendered. Re-

lator contends, however, that the duties of this respondent were not purely clerical or ministerial.

The issue raised as to this respondent is whether he is to bear any responsibility for the conditions existing in the legal department of the district. In denial of such responsibility counsel for the respondent argue that he properly performed the duties imposed upon him by law and the rules of the board; that he had no alternative but to approve the pay-roll lists but could have been compelled by judicial process to accept and remain in the office and to do the acts with which he is charged in the information, and this being so, he was guilty of no breach of his duty as a lawyer. In support of the argument of respondent's counsel that he was obliged to obey the rules as he found them, even though they were unwise, wasteful and injurious in their consequences, they have cited certain cases of this and other courts declaring that courts will not assume the right to pass on the wisdom or propriety of legislative enactments, as such questions rest in the legislative department of government. That rule has been many times announced by this court. The analogy sought to be drawn between the decisions of this court applying that rule and the instant case is based on the argument that if courts may not question the propriety of legislative enactments, surely a lawyer licensed by the court should not assume for himself such powers. No analogy exists between that. rule and the duty resting upon a lawyer to protect the interest of his client. In this case it was the duty of the attorney, under rule 12 of the board, to bring to the attention of the trustees matters pertaining to his department. It seems obvious he was thus required to bring to the attention of the board of trustees any matter in his department which was not for the best interest of the district for whom he and the trustees were acting. The argument that because he could not change the rules no duty rested upon him to protest is not impressive. Neither he nor the trustees of

the district were acting for themselves but under a trust given them by the people of the district. Counsel argue that this respondent cannot be disciplined for his acts certifying the lists or pay-rolls of the employees and the amount to be paid to each since required by the rules of the board so to do, and for the further reason that each of the persons whose names appeared on the list was legally entitled to the amount named. It is said that for these reasons it was respondent's duty, as an attorney for the district, to certify the list with the amount designated, and this being so, his action in so doing is not subject to criticism. It is said that each of the attorneys so listed was employed in the regular manner by the committee at a rate of compensation fixed by that committee, and as such assistant attorney was therefore entitled to the compensation fixed as long as the contract remained in force, irrespective of the amount of services rendered under the contract or whether any services were rendered.

A salary is a fixed, annual, periodical amount payable for services and depending upon the time of employment and not the amount of services rendered. In *Benedict* v. *United States,* 176 U. S. 357, it was said concerning the salary of Federal judges: "Such salary is an annual stipend, payable in sickness as well as in health, for duties much more onerous in some districts than in others and regardless of the fact whether such duties are performed by the judge in person or by the judge of another district called in to take his place. It is compensation which cannot be diminished during the continuance of the incumbent in office and of which he cannot be deprived except by death, resignation or impeachment." Where one is elected or appointed to an office, the fact that he because of illness does not for a given period discharge the duties of that office does not legally or morally deprive him of the emoluments thereof, but quite another situation arises where it is apparent to the incumbent of an office or employment that his services

are not needed because there is nothing for him to do and he knows that he is taking public funds for which no services are rendered or expected. As hereinbefore stated, the question in this proceeding is not whether these assistant attorneys could in an action at law recover judgment for salary accruing during the period of their employment, but whether they, as attorneys, when they came to understand, as they must be held to have understood before their relations with the district actually terminated, that notwithstanding the fact that the method prescribed by law for their employment had been used, were bound by their duty to the public to withdraw from such employment. So the question with this respondent, under these charges, is not whether there was a legal liability on the part of the district to pay the assistant attorneys appointed, but whether this respondent, cognizant of the fact that the trustees, in abuse of the power given them by the statute, were placing men on the pay-rolls in his department who were not earning their salary and whose services were not needed, acquiesced in such misuse of public funds, and if so, whether he is to be excused for so acquiescing, or whether it was his duty to bring to the attention of the board the condition of affairs in his department and to protest against the continuation of such condition, and, failing by such means to cure the evil, to withdraw his connection with the district.

It seems clear that if this respondent had a right to protest against the misuse of public funds by the extravagance and waste that characterized appointments to his department, he cannot be excused from raising such question with the trustees merely because he had nothing to do with the creation of that extravagance or because the rules of the board direct that such payments as shall be made to assistant attorneys shall be approved by him. The question first to be answered is whether respondent could, and should, have refused to acquiesce in the perpetration of

that which he must have known to be a wrongful expenditure of public funds. He knew that the appointment and payment of useless attorneys was a misuse of the funds placed in the hands of the district trustees. Had he refused to approve these lists or pay-rolls they would not have been paid. While it is the contemplation of the legislature, as expressed in the statutes, that the honest exercise of judgment by those empowered to transact the business of a municipality shall control, yet in a proceeding of this character, where it appears that the respondent must have known that the trustees were not exercising their honest judgment as to the necessities of his department, the claim that he, as a lawyer, had a right to continue as a passive instrumentality through whom such betrayal of trust was effectuated can scarcely be said to satisfy the demand placed on him by his profession.

What was the purpose of the requirement that the attorney certify and approve the lists or pay-rolls? It surely had some significance. It must have meant more than a mere means of apprising the warrant clerk that the records showed the appointment of these assistant attorneys. Such information could have been gleaned from the records themselves. If it was not the purpose of such rule that the attorney's certificate be taken as evidence that the head of the legal department knew and approved the fact that the named attorneys were carried on the pay-rolls as members of his department, what, then, could have been the purpose of that rule? The head of this department knew better than anyone else as to who on those rolls or lists was needed and who was not. No purpose is seen in the requirements of the rule that he certify the lists if his so doing was merely the act of an automaton.

It may be further observed that though it be conceded that the rules of the board required that respondent approve these lists or pay-rolls without regard to who or how many were on them or the amounts to be paid, yet the pro-

visions of rule 12 making it his duty, in addition to other requirements imposed upon him, to "bring to the attention of the appropriate committee all matters connected with his department," must be construed as imposing upon him the duty to call to the attention of the committee on employment any extravagance, waste or misuse of funds that existed by reason of the appointment of an excessive number of assistant attorneys. That was a matter directly "connected with his department." His counsel say that he in making up his annual budget gave an estimate as to the number of attorneys necessary to carry on the work of his department, and that if the board chose to go beyond that he could do nothing about it but had done his duty. As an attorney at law, charged with the duty to see that his client was not defrauded or that no fraud was perpetrated through his department, respondent clearly had the right, and it was his duty, not only under rule 12 of the board but likewise under the obligations resting upon him as an attorney at law, to bring that matter to the attention of the committee by way of protest. The argument that the sole responsibility rested upon the board is not convincing, where it was, as it must have been, apparent to him that the employment committee, which comprised the entire board, was violating its plain duty as trustee of public funds and public business. The question is, rather, what respondent, as a member of the profession charged with the duty of protecting the interest of the public who pay him, should have done when he discovered an injury directed against the public. An attorney in a public office owes to his profession the exercise of a lively concern that his conduct square with fair dealing, and that he do not, merely because of rules made by those whose official honesty he has a right to question, permit himself to acquiesce in acts which evidence little concern over honesty in official conduct.

But it is asserted respondent could have been compelled by *mandamus* to remain in office and to approve the pay-

roll at the will of the trustees, and if his acts did dovetail with or contribute to the waste of public funds such acts were merely clerical and render him in no way responsible. Of course, if this argument is sound this respondent cannot in this or any other proceeding be held accountable for the fact that his official acts contributed to such waste. Aside from the broad and firm ground that a threat of *mandamus,* or even criminal prosecution, may not be accepted as a defense for wrongful conduct, there is in this argument the question whether, under the law, respondent could have been by *mandamus* compelled to perform an act which he knew to be contrary to the requirements of honesty and his duty to his client or could be punished for his refusal in that behalf.

It is argued that he was under legal duty to accept the office to which he was elected and to carry out all the requirements imposed by the board of trustees. In support of this argument counsel cite *People* v. *Williams,* 145 Ill. 573, in which it is said: "It is held in numerous English cases that by the common law it was the duty of every person having the requisite qualification, elected or appointed to a public municipal office, to accept the same, and that a refusal to accept such office was punishable at common law." That case was a *mandamus* proceeding to compel Williams to execute a duty of a town clerk. The English authorities were there discussed. Attention, however, is there called to the fact that the offices affected by the rule in the English cases were those attended by onerous burdens without appreciable compensation. The holdings in those cases rest upon the rule that it was the duty of the citizen to contribute his services to the government when called upon. In Webb's English Local Government from the Revolution to the Municipal Corporations act, it is pointed out that the offices to which the rule of compulsory service was made applicable were principally offices of the parish, such as church warden, constable, surveyor of

highways and overseer of the poor. It was also sometimes applied to the office of mayor. They were unpaid. Service was compulsory upon any belonging to the parish who was selected to do that work. Maitland in his Justice and Police, page 104, finds the reason for the requirement to have been based upon the theory that every township should have its constable and that it was the duty of every man in the township to serve in that capacity for nothing, certain lawful fees excepted. He also points out that a man so chosen might provide a substitute. So it was with the office of mayor, as shown in numerous cases. That office was one entailing considerable expense and practically without emolument. Appointments were often made to those offices of burden for the purpose of imposing a fine in case of refusal to serve, thus acquiring revenue for the public treasury. (Webb on The Manor and the Borough, part 2, p. 468.) Among the English cases in which this rule of the common law was invoked are the following: *Prigg's case,* Aleyn, 78, (24 Charles,) where an officer similar to a constable in this State was indicted for refusal to serve; *City of London* v. *Vanacre,* 1 Salk. 142, holding that the sheriff of the city of London could be subjected to a fine for refusal to serve as such unless he made oath that he was not worth £10,000; *Rex* v. *Jones,* 2 Strange, 1146, (14 George II,) where an overseer of the poor was indicted for disobeying an act of Parliament; and *King* v. *Leyland,* 3 M. & S. 184, (1814,) where *mandamus* was sought to compel a mayor of Liverpool to serve as such. Of course, the reason for *mandamus* or prosecution shown to have existed in the common law cases does not obtain in this State as to offices of the character here involved, which entail a substantial salary. In this country, though it is not to be doubted that legislative power exists to impose penalties for refusal to qualify or serve in public office or to require such service, no such statute applicable to an office of the character of attorney for the sanitary district is here presented.

It is by no means clear what rules of the English common law relating to the punishment for crime exist in Illinois to-day independent of statute. In *Johnson* v. *People*, 22 Ill. 314, it was held that provisions of the Criminal Code relating to punishment for offenses not therein enumerated applied to acts which were offenses at common law. Only those acts deemed criminal under the common law as it existed prior to the fourth year of James the first (1606) are, in the absence of statute so providing, subject to punishment in Illinois. Counsel have referred to no American case, and we have found none, in which it has been held that in the absence of an applicable statute, criminal penalty for failure or refusal to serve in public office may be inflicted. Assuming that courts are to look to the English common law for the power to compel the discharge of official duties or to punish refusal so to do, it is apparent that the application of that power is to be limited to cases lying within the reason for its existence as shown by the old English cases. The office of attorney for the Sanitary District of Chicago, with its substantial remuneration, can hardly be said to be an onerous duty of citizenship which may not, in the absence of statute, be avoided at will.

The General Assembly of this State has imposed penalties for refusal to serve in certain township offices. (Cahill's Stat. 1931, chap. 139, art. 9, sec. 7.) Both in *People* v. *Williams, supra,* and *Edwards* v. *United States,* 103 U. S. 471, *mandamus* was ordered requiring a town clerk to discharge the duties of an office from which he had resigned. It was apparent in each of those cases that the resignation was for the purpose of evading the duty to make a certificate in the levy of a tax, without which government of the township could not function. While it may not·be doubted that the legislature has the power to impose a penalty for refusal to perform the duties of an office such as here involved, no such statute has been enacted in this State. No case has been cited, nor have we found one, holding that

under the common law an officer of the character of attorney for the Sanitary District of Chicago, could be required to continue in office when he chose to resign. It is true, resignation from an office having a tenure fixed for a specified time and until a successor is elected and qualified does not vacate the office until such successor is elected and qualified. In *People* v. *Supervisor*, 100 Ill. 332, a supervisor who had resigned but whose successor had not qualified was compelled by *mandamus* to sign bonds of the town. In that case it was necessary that a supervisor perform the duty imposed by law. His term was for a specified time. The statute provided that he be fined if he refused to serve. No such rule is applicable here and there is no basis for the asserted applicability of such rule. Respondent, while filling the office, could doubtless be required to carry out the lawful orders of the board, but this affords no basis for saying that he may be compelled by *mandamus* to do that which effectuated an illegal act of his superiors. The reason for the ancient common law rule as to burdensome offices of the town or parish does not exist in this case, and it may well be urged that no such rule should be applied to compel continuance in offices carrying large emoluments, in the absence of proof of injury to the public service by the resignation of the officer. It may be further observed that it is to be doubted whether the courts could by *mandamus* require that an officer perform an official act demonstrably against the public interest. It seems certain that they would not do so.

Though respondent was not responsible for the misdeeds of the board of trustees, he owed a definite duty to the public whom he served to refuse to be an instrumentality by which such dereliction of duty on the part of the board was accomplished. Respondent's counsel argue earnestly that acquiescence on his part was not shown, for the reason that acquiescence implies an agreement involving mo-

tive. Acquiescence, as defined by standard lexicographers, means a passive compliance as distinguished from avowed consent on the one hand or opposition on the other. There is no evidence in the record that this respondent brought about the employment of useless attorneys, but it is clear that he is guilty of an omission in the duty resting on him as a lawyer to protest and to refuse to act in aid of the wrong committed. He says that he believes that he had no right to speak. His duty as a lawyer as well as the head of the legal department not only conferred on him the clear right but likewise imposed on him the clear duty to do so. He may have thought that he could be compelled to certify these pay-rolls. He did not attempt to find out by refusing so to do. His position was that of one who knew of a wrongful abuse of the power of the trustees of the sanitary district in the expenditure of money, and who, though directed by rule 12 to report to the board this condition in his department, yet raised no protest. He did in his annual budget state the number of lawyers he deemed necessary to carry on the work of the department, which, it appears, was much less than the number put on the pay-roll. He thus knew that the board was doing that which it had no right to do, yet he continued to permit the working of the machine when his refusal to aid would doubtless have stopped it. With knowledge of the facts and appreciation of the situation which his experience must have afforded him, he failed to do what his position as a public servant and a member of the bar required of him. His failure in that regard made this misuse of public funds possible.

From what we have said it is clear that while the record does not contain evidence of connivance or active participation on the part of this respondent in the use of public funds to provide political sinecures it does show his acquiescence therein. He thus failed to meet the demands resting upon him as an attorney at a time when his response

thereto would doubtless have resulted in the rendition of valuable service to the public. His conduct requires discipline.

As hereinbefore indicated, charges such as are in this information have not heretofore, so far as we are advised, been filed against attorneys at law, and were they of a character calling for the announcement of a new standard of ethics we would be constrained to hold that no application thereof could be made to the charged delinquencies of these respondents, but, as indicated, these charges, while arising out of facts different from those heretofore passed upon by this court, are not new but are charges of violation of the principles of fair dealing and professional integrity, which not only are included in the training of each lawyer but which have always lain at the very foundation of the ethics of the legal profession. They are but the standards of common honesty and common conscience. It is but just, however, in determining the discipline to be applied, to make allowance for the fact that such discipline has not heretofore been meted out on these or similar charges. With this in view, and with the admonition to the bar generally that knowing failure in the duty which the legal profession places upon them to protect the public interest while occupying public office may result in disbarment, the following order is entered as to these respondents:

Respondent Frank J. Brewbaker, for the reasons given in this opinion, is disbarred and his name will be stricken from the roll of attorneys.

Respondent Joseph E. Paulissen, for reasons given in this opinion, is suspended from the privilege of practicing law for the period of two years.

The following respondents, for reasons given in this opinion, are suspended from the privilege of practicing law until May 1, 1933: Harry J. Berman, Arthur Donoghue, John C. Garriott, Jr., Maclay Hoyne, Henry E. Jacobs, Kleofas Jurgelonis, Joseph A. Kolb, Medard A. Kunz,

Nathan A. Lawrence, Sidney Lyon, Harry Mantell, Mark J. McNamara and Adam E. Patterson.

The following respondents, for reasons given in this opinion, are censured for dereliction of professional duty: John M. Beverly, David S. Chesrow, John J. Dillon, Robert H. Eberle, Daniel V. Gallery, Al F. Gorman, Thomas P. Grant, John S. Hall, Eugene M. Hines, John R. Horan, Philip A. Lozowick, Carl H. Lundquist, Stephen A. Malato, Arthur F. Manning, George H. Mason, Abraham L. Missner, William S. Newburger, Victor I. Ohrenstein, Leo V. Roeder, Ivor L. Smith and Augustus Williams.

As to the following respondents the rule is discharged: Hector A. Brouillet, Charles F. Brown, Roy J. Egan, John F. Higgins, A. Paul Holleb, Samuel J. Graff, Meyer D. Kaufman, John B. King, John M. Lowery, Edward P. Luczak, Edward H. Luebeck, John R. McCabe, James J. McDermott, Eugene L. McGarry, G. Edwin Mitchell and Wm. Scott Stewart.                    *Order entered.*

JONES and ORR, JJ., specially concurring:

We are in entire harmony with the general rules and principles announced by the court concerning the conduct which an attorney owes to the legal profession and to the public. However, we believe the discipline imposed by the majority of the court is in some instances excessive and unduly severe. Especially is this true in cases where the respondents entered into employment in good faith, expecting to render adequate services, but were not assigned enough work to justify the compensation they received. Some of the respondents were not long in the service. A number of others did a considerable amount of work and were promised the assignment of additional work. Several were shown by the record to be experienced and successful lawyers, who were retained expressly for trial work and at all times held themselves ready to perform the services for which they had been especially employed. Under these varying circum-

stances it is a serious question whether the particular respondent was guilty of misconduct which should subject him to a humiliating and degrading penalty. In a large number of these cases the record, by which we are bound, shows indisputably that the attorney accepted the employment in good faith. If an attorney has acted in good faith, though erroneously, this court should be firm in protecting his name and his right to practice law. It is only when the proof of moral turpitude is clear and free from doubt that disciplinary penalties should be inflicted. *People* v. *Thornton,* 228 Ill. 42.