(No. 25173.—

THE CHICAGO PARK DISTRICT, Appellee, *vs.* R. E. HERCZEL & Co. *et al.*—(FRANCIS X. MILANO *et al.* Appellants.)

*Opinion filed February 13, 1940—Rehearing denied April 3, 1940.*

CASSELS, POTTER & BENTLEY, UNGARO & SHERWOOD, SPITZ, McKENNA & ELMES, and FRANK PESKA, (RALPH F. POTTER, GEORGE C. BUNGE, LYMAN W. SHERWOOD, and IGNATZ SPITZ, of counsel,) for appellants.

JOHN O. REES, (MARTIN G. LOEFF, and HARRY P. HENSEL, of counsel,) for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

The Northwest Park District, later by statute consolidated with the Chicago Park District, brought an action against appellants and R. E. Herczel & Company, a corporation, to recover $71,000 alleged to have been illegally paid by the officers of the park district to R. E. Herczel & Company. The appellants are president Gubbins, secretary Brekke, treasurer Milano, of the park board, and The Glens Falls Indemnity Company which was on the bonds of the secretary and treasurer. Judgment was entered against all defendants in the superior court of Cook county and affirmed by the Appellate Court for the First District. R. E. Herczel & Company does not join in this appeal.

The gist of the charge is that the officers of the park district, contrary to law, issued two checks to R. E. Herczel & Company, one for $50,000 and one for $21,000, and that the appellant indemnity company, as surety on the bond of the treasurer Milano, in the sum of $20,000, and on the bond of Brekke, secretary, in the sum of $10,000, was liable to the extent of its bonds.

The original complaint, as amended, with additional counts, charged a conspiracy on the part of these officers of the park district to sell the bonds of the park district at

less than par, and to commit diversion of the funds for the illegal purpose of employing a lobbyist to secure legislative validation of a $2,000,000 bond issue which the district had voted, such validation being necessary because of limitation of indebtedness of the district.

On hearing in the superior court, without a jury, the court found the conspiracy was not proved, but that the illegal issuance of these checks in the sum of $71,000 had been proved and that all of the defendants were liable therefor. Appellant Gubbins, as president of the park district, was also a member of the board of park commissioners. He was the only one of the park commissioners made defendant to the suit. William J. Mannion, attorney for the park district, whom the record shows advised the board as to the legality of the expenditure, likewise does not appear as defendant.

There is little dispute in the facts. The Northwest Park District at the time of these transactions, was organized under an act to provide for park districts, etc. (Ill. Rev. Stat. 1939, chap. 105, par. 256.) Its official roster consisted of five commissioners, one of whom served as president, a secretary or superintendent, who, under the statute and ordinances of the district, was not a member of the board; also a treasurer and an attorney, both of whom were selected from outside of the board membership. The books and records of the district were kept at an office provided by the commissioners, who also employed three clerks in that office.

The record shows that in January, 1931, the attorney for the district prepared an ordinance authorizing a $2,000,000 bond issue; that that ordinance was adopted by the commissioners on January 26, 1931, authorizing the issuance of the bonds "for the purpose of providing funds for payment of land condemned or purchased for parks or boulevards, for the building, maintaining, improving, and protecting the same, and for the payment of expenses incident

thereto." The ordinance also required that the funds to be derived from such bonds should be used for the purposes specified and for no other purposes. On January 27, the day following the adoption of this ordinance, appellant Brekke, as secretary, sent out a letter to numerous bond houses, including the defendant R. E. Herczel & Company, hereinafter styled the bond company, calling for bids on this bond issue. This call for bids contained the information that the bonds were issued subject to validation by the State legislature, at no expense to the park district, and subject to approval by bond attorneys.

It appears from the record that in the latter part of January or the first of February, one Paul K. Van Winkle, vice-president of the defendant bond company, met one Lowell B. Mason, an attorney at law and former State Senator, who informed him, Van Winkle, of the contemplated issue of bonds by the park district, and suggested to him that his, Van Winkle's, firm bid for the bonds, and also suggested that as the bonds would need validation by the State legislature, he, Mason, be employed to secure such validation. They discussed the matter of Mason's fees and it was agreed that the fee should be $70,000 for obtaining the validating legislation. There is some evidence that this understanding was reached before the passing of the ordinance providing for the issuance of the bonds, but whether before or after is of no materiality. There was some evidence that Mason agreed that he would use his influence to the end that the defendant bond company might be the successful bidder for the bonds.

At the meeting of the board of commissioners on February 9, the bids submitted, including that of the defendant bond company, were opened, and the sale of the bonds was awarded to that bond company. It appears that prior to that meeting, Van Winkle, representing the defendant bond company, attended a meeting in the office of the attorney for the park district, at which the president and secretary were

present, and at which the bid to be submitted by the defendant bond company for the bonds was discussed. At this meeting Van Winkle informed the president and secretary that a sum of $71,000 would be required for validating the bond issue by legislation. He testified that he explained to them how it would work out at the time of the offering of the bid, and that it was agreed that the bond company submit a bid for the purchase of the bonds at par and accrued interest, and at the same time, though in a different letter, insist upon the sum of $71,000 as expenses for validating the issue, but by reason of a "bad psychological effect" on the voters of the district, this demand should not be submitted as a part of the bid. It was agreed that the payment of $71,000 was to be required, as expenses $21,000, and accrued interest on the entire bond issue from the date of the bonds, February 1, 1931, to August 1, 1931, following the adoption of the validating legislation, which amount was to be $50,000.

The record shows that after the meeting of the commissioners on February 9, the matter of increasing the bonded indebtedness of the district was submitted to a vote of the people, and was defeated. Subsequently the General Assembly enacted a statute validating certain bonds issued by park districts, including the Northwest Park District. (Ill. Rev. Stat. 1939, chap. 105, par. 299j.) That act provided that such bonds should not be sold for less than par and accrued interest.

It appears that on July 27, 1931, there was a meeting of the commissioners of the park district at which the commissioners and appellants, as officers, were present, in which a motion was passed to pay "the following bills," and a list of 144 bills, aggregating $246,976.20, was submitted, and among them were the following: "R. E. Herczel & Co. $50,000. R. E. Herczel & Co. $21,000." Checks were issued to pay these "bills" on August 18, 1931. On the $50,000 check appears the notation: "To R. E. Herczel & Co. Int.

due 8/1/31 on bond issue 19, $50,000." The $21,000 check recited: "Northwest Park District in settlement of following bills: 8/1/31 To R. E. Herczel Co. in part payment of expenses in connection with the $2,000,000 Northwest Park issue dated Feb. 1, 1931, as per agreement dated Feb. 9, 1931, $21,000."

At the time these bills were allowed and these checks issued, there was no money in the maintenance fund of the treasury in any way comparable to the amount necessary to meet such expense. The record shows that $300,000 of these bonds were at that time taken over by the bond company and a check for that sum given, which was deposited in the construction fund account of the district, and on the day of the issuance of the checks was transferred to the maintenance fund, on which the checks were drawn. The record shows that such transfer was made by the president, secretary and treasurer and without the direction or consent of the commissioners, although the subsequent report of the treasurer showing such transfer was approved by the commissioners.

It is apparent on the face of the transaction that the money was to be used for an illegal purpose and that a sale to the defendant bond company, with deductions of $71,000, for whatever purpose, was a sale of the bonds at less than par, contrary to the statute. These checks were issued, as we have noted, after the bills had been approved by the commissioners, and the issuance of checks ordered. It appears that Brekke, the secretary, who was likewise superintendent, was required, as a part of his duties, to present to the board, for approval, the vouchers arising from the bills against the district, and that in this case he submitted these bills with his approval. The fact that these "bills," when submitted and allowed, failed to disclose the real purpose or use of the money, was sufficient to have aroused a suspicion in the mind of anybody connected with the issuance of them. Fifty-one thousand dollars of this

money was to be paid to an attorney, Mason, and was delivered to his partner. Twenty thousand dollars was retained by the defendant bond company.

It is apparent from the record, also, that the real purpose for which this $71,000 was to be expended was not only discussed with the president and secretary before the meeting of February 9, but was likewise discussed at the meeting at which the bids were considered, and with all the defendant officers present. It is not even contended, here, that expenditures for lobbying to obtain increase of municipal powers, is a legal use of those funds. The money that was received and deposited to the credit of the Northwest Park District, was a trust fund to be used only for the purpose for which the bonds were issued and sold to the public. Though the check for $50,000 was purported to be for accrued interest on the entire $2,000,000 bond issue from February 1, 1931, to July 1, 1931, but $300,000 of the bond issue had been taken up by R. E. Herczel & Company, and at no time was over $600,000 of this bond issue sold. It must have been apparent to any one having anything to do with the issuance of these checks, that they were improperly issued, and that the use for which the money was expended was an illegal use.

The argument is made that, so far as these defendant officers are concerned, they could do nothing but follow the orders that were given by the commissioners. The rule is that public officials, in the performance of their official acts, are presumed to act in good faith and with honest motives, (*Tribune Co. v. Thompson,* 342 Ill. 503,) and where such officials, having no reason to doubt the correctness of the order of the governing body, commit positive acts without notice of their illegality, on direction of the controlling officers of the corporation, the corporation is usually estopped to collect against them. (*Trustees of Schools v. Village of Cahokia,* 357 Ill. 538; *Melin v. Community Cons. School District,* 312 id. 376; *Logan County v. City of Lin-*

*coln,* 81 id. 156.)   However, if such officers have knowledge of the illegality of the acts of the commissioners, they will not be excused from the responsibility of their own acts in carrying out such illegal acts merely because they are directed by the governing body so to do.   (*In re Sanitary District Attorneys,* 351 Ill. 206.)   The Appellate Court found, on a review of the evidence, that defendant officers of the district knew of the illegal purpose to which this money was to be devoted even before the issuance of bonds was authorized.

It is argued on behalf of appellant Milano, as treasurer, that he had nothing to do with the matter of determining how the money should be expended and that he did not know of the illegality of this use, and that there was no evidence for the Appellate Court to consider, tending to show such knowledge.   It is difficult to understand, however, why he should not have known of the illegal use to which this money was to be put at the time he signed the checks.   It is evident from the record that the matter was discussed in his presence at meetings of the commissioners. While he was not present at the meeting of Van Winkle and the president and secretary of the district, in the office of the attorney for the district, when the method and expense of securing legislative validation of the proposed bond issue was fully discussed, it is clear that he was in attendance at meetings of the commissioners when such matter was explained.   Without orders from the commissioners he signed the check making transfer of the funds from the construction account to the maintenance account.   The record contains evidence which the Appellate Court doubtless considered in determining that the treasurer had notice of the illegality of these expenditures.

Nor is it a defense available to appellants to say that Mannion, the attorney for the district, was present and advised that the action was legal.   These officers must be held to have had notice of the law covering their duties

and of the act validating these bonds, and providing that the money arising therefrom should not be expended for any purpose except that which was indicated in the original ordinance.

While the business of this district was loosely conducted, it seems clear to us, as found by the Appellate Court, that the defendant officers had notice that these funds were being expended for the illegal purpose of lobbying to procure a validating act. Liability on the part of the secretary and treasurer establishes liability of appellant the Glens Falls Indemnity Company which signed their official bonds.

We are of the opinion that the superior court did not err in entering judgment against these defendants, and that the Appellate Court was right in affirming it.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*